**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**No. 97-60708**

---

**AVONDALE INDUSTRIES, INC.,**

**Petitioner/Cross-Respondent,**

**v.**

**NATIONAL LABOR RELATIONS BOARD,**

**Respondent/Cross-Petitioner,**

---

**Petition for Review for Enforcement of the**
**order of the National Labor Relations Board**

---

July 7, 1999

Before REYNALDO G. GARZA, JONES, and DeMOSS, Circuit Judges:

EDITH H. JONES, Circuit Judge:

Avondale Industries, Inc., a shipbuilding company, engaged in a short but hotly-contested union representation election with the New Orleans Metal Trades Council, AFL-CIO ("the Union"), which was vying for a bargaining unit of approximately 4,000 employees. The issue that is determinative on appeal is whether the National Labor Relations Board enforced voter identification procedures that sufficiently protected the integrity of the election. Under the circumstances presented here -- a very large work force, the NLRB's foreknowledge that a substantial number of the votes would be challenged, observers unable to be

personally acquainted with the voters, multiple voting zones, an 11 1/2-hour election day without rigid controls over employee access to the polls, serious allegations of improper campaign tactics, and a close result -- we conclude that the voting identification procedures were fatally flawed.  The NLRB's bargaining order may not be enforced, and a new election must be conducted.

## I.  FACTUAL AND PROCEDURAL HISTORY[1]

On May 11, 1993, the Union petitioned the NLRB for a representation election at Avondale.  Following a representation hearing, Avondale and the Union executed a consent agreement for an expedited election to be held on June 25, 1993 -- sixteen days after the agreement was consummated.

Two weeks before the election, Avondale supplied the Union with an Excelsior[2] list of eligible voters.  The Excelsior list included the last name, first initial, and home address of the eligible employees.  Although the Union requested a more detailed Excelsior list containing the first name and employee number of the

_____

[1]     On appeal, Avondale has challenged several procedural aspects of the representation election including the NLRB's certification of the bargaining unit, the challenge ballot process employed during the election, and the Union's allegedly racially discriminatory use of challenges.  Avondale also asserted several due process claims regarding the post-election hearing.  Because we decide this case on the issue of voter identification, a complete discussion of the other issues underlying the appeal is unnecessary.

[2]     Excelsior Underwear, 156 N.L.R.B. 1236, 1239-40 (1966) (requiring employer to turn over list of the names and addresses of all eligible voters in certification election).  The Excelsior list provided by Avondale listed all eligible voters, including a group of employees whose unit status was not yet determined -- the Not On List ("NOL") employees.

2

eligible voters, Avondale initially refused to provide the information.[3] On the eve of the election, however, Avondale revised its position and offered to place employees' first name and employee number on the identification lists to be used during actual balloting. The Union rejected this offer.

Electioneering was contentious and bitter. Moreover, because the company and union could not agree on the size and composition of the bargaining unit, the NLRB was aware that hundreds of NOL employees would have to cast challenged ballots. As the election approached, the Union threatened to issue up to 1,000 challenges. Particularly troubling are allegations that the Union made racial appeals to win votes.

The election was held at Avondale as scheduled. Polling was conducted at five voting zones dispersed within the sprawling industrial facility. Each of the zones was manned by three NLRB officials and four election observers -- two from Avondale, and two from the Union. Two lists of employees were furnished. A "Master Voting List" enumerated all employees (except the NOL employees) eligible to vote in the election, identifying them by their last name, first and middle initial, and address. The "Zone Voting

_____

[3] When created, the Excelsior list provided by Avondale complied with controlling NLRB precedent. In 1994, the NLRB revised the Excelsior list requirements. Now, an employer is required to furnish the full name of all eligible employees. See North Macon Health Care Facility, 315 N.L.R.B. 359, 361 (1994) (finding an employer's refusal to supply only the last name and first initial of eligible employees constituted objectionable conduct).

List" employees broke down the Master List to identify employees who were assigned to vote in a particular zone.

Supervisors escorted most employees to the voting zones during regular work times. When an employee presented himself to vote, the employee identified himself by name at the check-in table. If the employee could not be identified by name, the observers were advised to ask the employee's address or to identify him by his identification badge. Avondale, a defense industry contractor, enhanced plant security with employee identification badges that contain the employee's first name and employee number and a thumbnail-size photograph. When the employee's name appeared on the Zone Voting List, the list was marked and the employee allowed to vote. If the employee could not be identified, or was challenged by the Union "for cause," or was an NOL employee, the employee voted subject to challenge. Eventually, 850 challenges were issued. Given the 3,000 unchallenged voters, complaints were made against approximately one out of every four voters.

While initial results suggested a 600-vote margin of victory for the Union, Avondale's defense of the challenged ballots was surprisingly successful. The NLRB hearing officer counted over 70% of the disputed, counted ballots for the employer, reducing the

Union's victory margin to about 250 votes.  A swing of 130 votes would reverse the election results.[4]

Pertinent to this appeal, Avondale challenges the integrity of the election in two ways.  First, the company complains that NLRB refused to enforce any system of routine voter identification beyond voluntary self-identification.  In practical effect, no one can be sure who voted in the representation election.  Second, the NLRB disabled Avondale's post-election investigation of this issue, as it steadfastly withheld copies of the marked voter list that would have revealed who voted, how often they may have voted, and the status of challenged voters.  After Avondale successfully prosecuted a Freedom of Information Act case up to this court to obtain the voter lists, and then analyzed the lists, uncovering potentially suspicious voting involving hundreds of ballots, NLRB refused to reopen the certification hearing and summarily dismissed this part of Avondale's claim.  The NLRB, acknowledging that no routine voter identification system was in place, responds that it used "standard voter identification

---

[4]     The original count was 1804 for the Union and 1263 for Avondale, with 850 challenged ballots.  Five hundred fifteen challenged votes were counted, with Avondale receiving 369 of these votes to 146 for the Union.  See ibid.  Fifty-nine votes remained undetermined, which, under established Board precedent, are assumed to be added to the lower total to determine whether the election can stand.  See, e.g., NLRB v. Pinkerton's, Inc., 621 F.2d 1322, 1329-30 (6th Cir. 1980); Byers Eng'g Corp., 324 N.L.R.B. 125 (1997); Wolverine Dispatch, Inc., 321 NLRB 796 (1996).  Accordingly, the final vote total was 1950 for the Union to 1691 (1632 plus the 59 undetermined voters) for Avondale, for a gross difference of 259.

5

procedures," that Avondale's arguments are exaggerated, no evidence of voter fraud exists, and the election should not be overturned on speculation.

## II.  ANALYSIS

An order requiring an employer to negotiate with a union will be enforced if the NLRB's decision to certify the union is "reasonable and based on substantial evidence in the record." NLRB v. McCarty Farms, Inc., 24 F.3d 725, 728 (5th Cir. 1994). The certification order's enforceability depends, in turn, on the validity of the underlying election. See id. (citing NLRB v. Hood Furniture Mfg. Co., 941 F.2d 325, 328 (5th Cir. 1991)). If the union was not certified properly, this court may refuse to enforce the unfair labor practice order and remand the proceedings to the NLRB. See Deming Div., Crane Co., 225 N.L.R.B. 657, 657 n.3 (1976).

A representation election is presumed to be fair and regular, unless proven otherwise. See NLRB v. Mattison Mach. Works, 365 U.S. 123, 124, 81 S. Ct. 434, 435 (1961). In overseeing a representation election, the NLRB aspires to "an ideal atmosphere in which a free choice may be made by employees, protected from interference by employer, union, Board agent or other parties." Home Town Foods, Inc. v. NLRB, 416 F.2d 392, 396 (5th Cir. 1969) (citations omitted). While "laboratory conditions" represent the ideal, "clinical asepsis is an unattainable goal in the real world

6

of union organizational efforts." NLRB v. Sumter Plywood Corp., 535 F.2d 917, 920 (5th Cir. 1976). Thus, a reviewing court must compare the conduct of a challenged election to the laboratory conditions paradigm, recognizing the contaminating influence of "the realities of industrial life." Exeter 1-A Ltd. Partnership v. NLRB, 596 F.2d 1280, 1283 (5th Cir. 1979).

When examining the voter identification procedures employed in a representation election, this court does not sit to determine "whether optimum practices were followed, but whether on all the facts the manner in which the election was held raises a reasonable doubt as to its validity." NLRB v. ARA Servs., Inc., 717 F.2d 57, 68 (3d Cir. 1983); see also Polymers, Inc., 174 N.L.R.B. 282, 282-83 (1969). Even under this deferential standard, however, reasonable doubt means "reasonable uncertainty," not "disbelief" or "conclusive proof". Allentown Mack Sales and Service, Inc. v. NLRB, 522 U.S. 359, ____, 118 S. Ct. 818, 823 & n.2 (1998). Voter identification procedures appropriate for representation elections in small units may be inadequate when the eligible voting pool becomes very large. As the NLRB Casehandling Manual suggests, "[Voters] may also be asked for other identifying information, as appropriate and as formerly agreed on." NLRB, Casehandling Manual (Part Two), Representation Proceedings, § 11322.1 (emphasis added) ("NLRB Casehandling Manual")

7

Thus, in Monfort, Inc., 318 N.L.R.B. 209, 209-10 (1995), NLRB rejected challenges to individuals who claimed their names had been crossed off the voter lists before they arrived at the polls, where employee identification cards were used to assist in identification in a 1,500 employee unit. More on point with this case, in Newport News Shipbuilding and Dry Dock Co., 239 N.L.R.B. 82, 88 (1978), the election officials utilized the last four digits of social security numbers to identify voters in a 19,000 employee unit. NLRB relied heavily on this method of identification to prove the overall accuracy of the election. As a result, the Board emphasized that limited deviations from the procedure -- whereby observers asked "only" for voters' names for a few minutes at one polling site when polling was very heavy -- could not prejudice the overall election results. See id. NLRB described the Newport News voting procedure as "certainly consistent with established Board practices." Id.

In the Avondale election, by contrast, only the voter's name was required to permit an employee to vote. There is no dispute that this was the routine practice followed in the election. During the post-election hearing, after Avondale had introduced voluminous testimony on the practice, the NLRB hearing officer entered an order precluding further similar evidence as "cumulative or irrelevant." NLRB justifies verbal self-identification as its norm and standard procedure, evidenced by the

8

testimony of Assistant Regional Director ("ARD") Joseph Norton, the NLRB's director for the Avondale election:

> [N]ot only in this election, but in any election, we <u>assume</u> that when John steps up to the table and he is asked his name and he says, I am John Doe. And [election observers] say, where do you live? And he says, I live at 102 Smith Street, that this is the John Doe that lives at 102 Smith Street. What further identification do you need. <u>There is a presumption, if you will, that [voters] are not going to walk in to lie</u>. Moreover, in this particular situation, [voters] are actually being controlled from the point of where they worked to the voting area. <u>Why would [voters] not be telling the truth</u>? <u>Why would voters lie as to their name and where they live</u>? (emphasis added).

Parenthetically, it must be added that asking employees to give their addresses for identification purposes was not, contrary to ARD Norton's testimony, the routine procedure employed in the Avondale election.

NLRB attempts to deflect its responsibility to protect the integrity of the ballot by noting that the Union and Avondale could not agree on a system of objective voter identification[5] and by implying that the ARD learned too late the inadequacy of employee badges for this purpose. NLRB also charges the election observers with dereliction for any deficiency in identification

---

[5] Avondale offered to provide full first and last names and clock numbers on the Master and Zone Voting Lists the night before the election. Unfortunately, the Union, retaliating for what it believed was inadequate information on the <u>Excelsior</u> list, rejected Avondale's offer. At oral argument in this court, the Union offered no logical explanation for this rejection.

procedures, because observers appointed by the parties "not only represent their principals but also assist in the conduct of the election." NLRB Casehandling Manual, § 11310.  But notwithstanding the flexibility allowed for in-person voting  procedures and the incentives for the parties to agree and cooperate, the buck stops with the NLRB.  The first admonition in the Board's manual for the conduct of elections is:

> The responsibility for the proper conduct of the election is the Regional Director's acting through the assigned Board agent.  Extreme care must be exercised both in the preparation and in the conduct of elections.

NLRB Casehandling Manual, § 11300.

The integrity of an election cannot be maintained without assurance that the voters who cast ballots were eligible to do so. Thus, voters had to be employees whose names were on the lists agreed to by the Union and Avondale, and they had to identify themselves as the persons enumerated in the list.  The importance of reliable voter identification is reflected in NLRB's elaborate precautionary rules governing mail-in ballots.  See NLRB Casehandling Manual, § 11336.  Obviously, more flexibility is called for in developing identification procedures for in-person balloting.  Representation elections cover bargaining units that may range from a few dozen employees at one worksite to thousands of employees dispersed among multiple shifts at numerous worksites. Verbal self-identification is appropriate when -- as is probably

10

true in a large portion of cases -- it is likely that the observers are personally acquainted with the voters. It is wholly inadequate, however, as the sole guide to identification, where a very large bargaining unit is contemplated, and the voter lists contain virtually the only information that will assure the identity of the voters. The procedures used in Newport News and Monfort, Inc. confirm this common sense notion and equally condemn the unthinking adoption of "standard practice" for a multi-thousand employer like Avondale.

The voter identification procedure in this case was utterly insufficient. It is undisputed that most of the observers did not know the hundreds of employees who appeared during their stints at each of the voting zones. It is also undisputed that employee badges, which stated the employee's first name only and had a tiny photograph, were inadequate to prove that the voter was the person whose last name, first and middle initials, and address appeared on the Zone and Master Voting Lists. According to the procedure used, an employee whose first name was "Jane" could identify herself as any voter on the Zone list with a first initial "J" and could vote on no more sure proof of identity.[6] Lest this

---

[6] Not only could an employee without an identification badge often vote unchallenged merely by giving another person's name to the observers, but a voter with an identification badge and the same first initial of a voter on the Zone Voting List could also vote unchallenged. Thus, an employee with "John" on his identification badge could vote for any employee identified on the Zone Voting List whose first initial was "J." In either situation, no observer would need to ask for further identification, such as an address -- the fraudulent voter's

11

be thought an unlikely possibility, the NLRB hearing officer adjudicated fourteen claims regarding employees whose ballots were challenged because they appeared to vote after their names had (perhaps erroneously) already been crossed off the voting lists.[7] The NLRB hearing officer confirmed the identification procedures as a source of potential confusion:

> [m]ost importantly, many of the employees had corresponding initials which might have created some confusion in regard to the checking off of the correct names. I have also noted that the employees' badges did not contain the last names of employees which might have exacerbated the confusion. . . .[8]

Had the voting list contained full names and employee clock numbers or social security numbers, information which could quickly be corroborated by the employee or a driver's license, no uncertainty would have arisen.

NLRB objects that most voters truthfully identify themselves. This is undoubtedly true, and was undoubtedly true in this election, but it does not detract from NLRB's own reliance on

---

assumed name would have appeared on the list as an eligible voter. In his testimony, ARD Norton admitted as much.

[7] This being Louisiana, the duplicate names included Chauff, Boutain, Thibodeaux, and Plaisance, as well as more common names like Taylor.

[8] The hearing officer implied at this point that the deficient information on the voting lists was attributable to Avondale, because it "provid[ed] an _Excelsior_ list with first initials of employees instead of Christian names". The officer erred in drawing this conclusion. Avondale volunteered before the election to add full names to the voting lists, but the Union refused. Moreover, ARD Norton testified that the _Excelsior_ list was a completely separate document that he never saw; consequently, any limitations on the _Excelsior_ list cannot be lumped with the inadequacy of the voting lists.

the last 4 digits of social security numbers in <u>Newport News</u> as a visible assurance of election integrity. Moreover, the truism lacks force in this election for two powerful reasons. First, the election contest was bitter and hostile, sure to provoke suspicion in whichever party lost. From the number of threatened challenges and the parties' inability to agree whether hundreds of employees would be in the bargaining unit, to the parties' other disagreements every step of the way toward the election, ARD Norton should have foreseen a prolonged administrative struggle. An objective voter identification procedure would have belied suspicions, discouraged attempts at vote fraud, and averted this source of future litigation. Second, the election was close. The Union finally achieved 54% of the votes, but a margin of only 130 votes out of nearly 4,000 cast and counted controlled the result. The wisdom of hindsight cannot alone dictate rejection of the inadequate voter identification procedure, but it confirms that NLRB must deploy its flexibility with "extreme care", especially when conducting high profile, hotly-contested representation elections.[9]

---

[9] NLRB contends that requiring verification by means of employee driver licenses, social security numbers or clock numbers is impractical. But social security numbers were used successfully, indeed were relied on by NLRB, in <u>Newport News</u>, where a 19,000 member bargaining unit was at issue, and, given the 65 polling places used there, an average of 1,250 voters were appearing at each station. The common experience of any adult who has voted at the local precinct and been required to produce a voter registration card conflicts with NLRB's complaint.

On a more fact-specific level, parroting the hearing officer's allocation of responsibility, the NLRB and the Union have attempted to saddle Avondale with the blame for any failure in voter identification. They contend that Avondale exercised extensive control over when and where the employees voted, thus limiting the potential for voter fraud. Although the company's escort procedures were of some benefit, they by no means furnished the exclusive means for voting. No employer controls could be or were applied during lunch, breaks, or shift changes, when employees were allowed to vote without being escorted to the voting zone by their supervisor. No one had to vote when taken to the polling place by the supervisor. The supervisor did not oversee the name under which an escorted employee purported to vote, and nothing prevented unescorted fraudulent voting during lunch, breaks, and shift changes. Employees absent from work could come in at any time to vote. Staggered voting and zoned polling places can not replace inadequate voter identification procedures.

The crux of the inadequate identification procedure is this: no one knows exactly who voted in the Avondale election. Moreover, the challenge procedure could not function properly, where the initial and usual method for identifying a voter was an identity between his first name and stated last name and the initial and last name on the Zone or Master List. Election observers would have had to interfere with the "routine" procedure

in nearly every case in order to compel objective identification or insist upon challenges. The ultimate basis for approving the outcome of this election is the NLRB's hope that most employees voted truthfully. Such a hope does not fulfill the standard of "extreme care" that the NLRB itself sets for the conduct of representation elections. The NLRB's reliance on mere hope, unsupported by objectively verifiable voter information, raises a reasonable doubt as to the fairness and validity of the election.

While evidence of voter fraud could not be reliably investigated based on the voter identification procedures used at Avondale, the company nevertheless produced specific evidence of potential voter fraud stemming directly from the failed identification procedures. When Avondale finally received the marked, unredacted voting lists,[10] many employees allegedly absent from work on the date of the election were shown as voting. The gate logs at Avondale, a highly secure facility, failed to confirm entry by many of these absent employees.[11] In Voting Zone 3, many

_____

[10] Avondale was forced to file a Freedom of Information Act claim against the NLRB in order to recover the lists. See generally Avondale Indus., Inc. v. NLRB, 90 F.3d 955 (5th Cir. 1996).

[11] The marked, unredacted voting lists indicate that potentially 126 employees absent on the day of the election cast ballots in the representation election. Of the 185 ballots cast by absent workers, Avondale is able to account for only 59 of the "absentee" ballots through excused, election-related absentees and by checking available gate logs for plant entry by otherwise absent employees for election purposes. Although Avondale was unable to locate the gate log for one gate, and employee movement during shift changes and lunch breaks is not recorded on the logs, the evidence was sufficiently specific to raise considerable doubt regarding the absentee employees' participation in the election.

15

employees were marked in a strange fashion, potentially indicating that the employees cast more than one ballot.  Other anomalies appear in comparing the actual voting lists with extrinsic identification methods.[12]  Although the NLRB offers plausible explanations for some of these anomalies, no hearing was held on Avondale's late-obtained evidence, and we are thus required to view it in the light most favorable to Avondale.  See Trencor, Inc. v. NLRB, 110 F.3d 268, 270 (5th Cir. 1997).  At the very least, Avondale's evidence raises serious questions concerning the possible occurrence of vote fraud.

## III.  CONCLUSION

The NLRB's failure to implement more extensive identification procedures for this large-scale representation election, combined with evidence of potential voter fraud, raises serious questions regarding the validity of the representation election conducted at Avondale.  We do not minimize the difficulties faced by ARD Norton in overseeing the contentious election and mediating between two difficult parties, nor do we condemn the herculean efforts of the hearing officer in post-

---

[12]     According to the affidavit of Rhonda W. James, a paralegal employed by Avondale's attorneys, the marked, unredacted voting lists showed at least 13 "phantom" ballots (i.e., while 3265 votes were cast from "listed voters" in the election, only 3252 employees were marked as having voted) and 100 multiple-vote voters.  In fact, the NLRB sustained a challenge to the ballots of seven voters because, "Although . . . observers might have inadvertently checked off the wrong names . . . this evidence was insufficient to prove that any of the challenged ballots at issue were the first and only ballots cast by the voters in question." NLRB Decision and Direction, at 6-7 (Feb. 5, 1997).

16

election proceedings.  Unfortunately, based on the above-discussed characteristics and systemic failure in the Avondale electoral process, the mistakes cannot be remedied by remand for additional post-election hearings.  Accordingly, we <u>REMAND</u> this action to the NLRB with instructions to set aside the representation election held at Avondale on June 25, 1993, and to conduct further proceedings consistent with this opinion.  The NLRB's order requiring Avondale to bargain with the Union is <u>VACATED</u>.  Avondale's motion to supplement the record is <u>DENIED</u>.

**VACATED** and **REMANDED.**