# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60861

United States Court of Appeals
Fifth Circuit

**FILED**
September 27, 2016

Lyle W. Cayce
Clerk

CON-WAY FREIGHT, INCORPORATED,

    Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

    Respondent Cross-Petitioner

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Before STEWART, Chief Judge, and CLEMENT and HAYNES, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Con-way Freight, LLC ("Con-way") petitions for review of a union election at its Laredo, Texas facility, and for review of a National Labor Relations Board ("Board") Decision and Order finding that Con-way engaged in unfair labor practices. The Board cross-applies for enforcement of its Order. Con-way's petition is DENIED; the Board's cross-application is GRANTED.

No. 15-60861

I

Con-way provides freight services across North America and employs over 100 drivers and dockworkers at its Laredo, Texas facility. In 2014, a group of Con-way employees in Laredo contacted the International Brotherhood of Teamsters, Local 657 ("Union") regarding possible unionization. Two representatives of the Union met with a group of Con-way employees and explained that, once a sufficient number of employees signed representation cards, the Union could petition the Board to conduct an election for purposes of collective bargaining representation. The Union representatives visited with Con-way employees multiple times, collecting signatures. Several employees also volunteered to provide additional signature and membership cards to coworkers and to campaign in support of the Union.

Once enough signatures were collected, the Union petitioned the Board for an election. An election was scheduled for the following month. Leading up to the election, a small number of employees reported feeling harassed and intimidated by pro-Union coworkers, with some employees testifying that they were threatened with termination if they did not support unionization. In addition, several anti-Union employees' vehicles were vandalized in the weeks prior to the election, though no culprits were ever identified.

Before the election, the Board agent held a pre-election conference with the parties. Con-way was represented by an experienced labor attorney, its own assistant general counsel, and its selected observer. The Union was represented by one of the representatives who had previously met with Con-way employees and its selected observer. The Board agent arranged to hold the election in the training room at the Con-way facility. Neither Con-way nor the Union objected to the Board agent's arrangement of the voting area at the pre-election conference.

No. 15-60861

After the pre-election conference concluded, the voting began. Employees entered the training room one at a time and filled out their ballots behind a shielded voting lectern. The Board agent and each party's observer were present in the polling place. The election was close, but the Union won: 55 yea votes against 49 nays, with an additional four challenged ballots that went uncounted.

Following the election, Con-way filed a number of objections and the Board ordered a hearing. The hearing officer recommended overruling all of Con-way's objections. The Board adopted the officer's recommendation, and certified the Union as the employees' collective bargaining representative. Con-way refused to negotiate with the Union following the election, leading the Union to file an unfair labor practice charge with the Board. The Board eventually issued a final Decision and Order, finding that Con-way engaged in an unfair labor practice when it failed to bargain with the Union. Con-way petitioned this court for review of the election and the Board's subsequent Order. The Board cross-applied for enforcement.

II

"Congress has given the Board wide discretion in the conduct and supervision of representation elections, and the Board's decision warrants considerable respect from reviewing courts." *NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 328 (5th Cir. 1991). "Our review is limited to determining whether the Board has reasonably exercised its discretion, and if the Board's decision is reasonable and based upon substantial evidence in the record considered as a whole," the Board's decision will be upheld. *Id.* "There is a strong presumption that ballots cast under specific [Board] procedural safeguards reflect the true desires of the employees." *Id.* "A party seeking to overturn a Board-supervised election bears a heavy burden. Its allegations of misconduct must be supported by specific evidence of specific events from or

3

No. 15-60861

about specific people. Further, an election may be set aside only if the objectionable activity, when considered as a whole . . . influence[d] the outcome of the election." *Boston Insulated Wire & Cable Sys. v. NLRB*, 703 F.2d 876, 880 (5th Cir. 1983) (internal quotations and citations omitted).

## III

Con-way raises five separate arguments for setting aside the results of the election: (1) the Board agent failed to ensure the secrecy and privacy of the election; (2) the Board erroneously held that a group of pro-Union employees were not agents of the Union; (3) Union agents engaged in objectionable electioneering; (4) the election was held in an atmosphere of fear and intimidation sufficient to taint the results; and (5) we should invalidate the election results because the closeness of the election, combined with the evidence supporting the four other grounds, is sufficient to taint the results. We address each of these in turn.

## A.

Con-way argues that the Board agent compromised the integrity of the election by failing to use a proper voting booth, failing to correctly assemble the cardboard shield used in place of a voting booth, and by not securing the secrecy of the polling area. Ballots were cast in a three-sided cubicle-shaped device specifically designed for elections, called the "Poll Master II." The training room that was used as the polling place shared a door with the breakroom, where voters entered and exited. Persons in the breakroom could see the front of the booth when the door opened, but they could not see what a voter was doing inside the booth. The Poll Master II consists of a three-sided cardboard shield for privacy, a plastic base into which the cardboard shield is inserted, and aluminum height-adjustable legs onto which the shield and base may be placed. The Board agent inserted the shield into the base, and then placed the shield and base on top of a table in the polling place rather than on

the aluminum legs. Con-way maintains that because the table was slightly lower than the legs would have been, observers were able to see more of the voters' upper torso and arms while voting. Con-way argues that this increased exposure to prying eyes may have intimidated voters and caused them to change their vote. We disagree. Observers were simply not able to see how voters filled out their ballots.[1]

## B.

Con-way contends that a group of pro-Union employees who campaigned for unionization constituted an in-house "Union Committee," and were therefore the Union's agents. We apply common law agency principles in the labor law context. *See Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 480 (5th Cir. 2001). "One of the primary indicia of agency is the apparent authority of the employee to act on behalf of the principal." *Id.* "The test of agency in the union election context is stringent, involving a demonstration that the *union* placed the employee in a position where he appears to act as its representative." *Tuf–Flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir. 1983) (emphasis in original). An employee who engages in "vocal and active" support does not become an agent on that basis alone. *United Builders Supply Co.*, 287 N.L.R.B. 1364, 1364 (1988) (holding that an employee's status as a leading union supporter was insufficient to establish general union agency).

Here, the Union never appointed any employee to serve on any type of committee on its behalf. No employee served as the primary communication conduit between the Union and other Con-way employees. The Union dispatched its own representatives who visited the facility on multiple occasions, meeting with employees to explain the election process and garner

---

[1] At oral argument, counsel for Con-way suggested that, by seeing the upper arm and shoulder, an observer might be able to read a voter's body language and determine which side of the yes/no ballot was being marked. We find that argument unavailing.

No. 15-60861

support. There were, to be sure, employees who distributed membership cards to their coworkers and advocated for unionization, but, as the hearing officer noted, "[t]hese interested employees were equals, just employees working concertedly as a group in their common interest." In any union election, it is very likely that pro-union employees will make concerted efforts to persuade their colleagues.  Such attempts at persuasion do not make employees agents of a union.

C.

J. J. Martinez ("Martinez") was the Union observer during the election. Con-way argues that, while observing the proceedings, Martinez engaged in improper electioneering, surveillance, and list-keeping. Martinez made some ambiguous remarks to a few voters when they entered the polling place, such as "here we are;" "this is how we do it;" and "you know what you have to do." It is true that "sustained conversation" between parties to the election and employees preparing to vote "constitutes conduct which," "regardless of the remarks exchanged," "necessitates a second election." *Milchem, Inc.*, 170 N.L.R.B. 362, 362 (1968). "[A]pplication of this rule," however, is "informed by a sense of realism." *Id.* At 363. Martinez's brief, isolated remarks do not violate the *Milchem* rule. *See Hood Furniture*, 941 F.2d at 329 (noting that "prolonged conversations" are required to violate the *Milchem* rule). Martinez also apparently flashed a thumbs-up signal to some voters, but there is no evidence that these signals were "clearly linked to any instructions to vote for the Union." *U-Haul Co. of Nevada, Inc.*, 341 N.L.R.B. 195, 196 (2004).

In his role as observer, Martinez checked off the names of eligible voters as they entered the room to receive their ballots. It is "well-established" that an election may be set aside "if employee voters know, or reasonably can infer, that their names are being recorded on unauthorized lists." *Days Inn Mgmt. Co. v. N.L.R.B.*, 930 F.2d 211, 215 (2d Cir. 1991) (internal quotation omitted).

No. 15-60861

There is no evidence here that Martinez created or maintained a separate list of voters in violation of Board rules.

Although we do not condone Martinez's sometimes unprofessional behavior, the Board reasonably exercised its discretion in concluding that none of his actions were sufficient to "destroy the atmosphere necessary for a free choice in the election and thus to warrant setting the election aside." *Hood Furniture*, 941 F.2d at 329.

### D.

Con-way further argues that the election is invalid because it was conducted in an atmosphere of fear and intimidation. Specifically, Con-way alleges that Union agents and third parties threatened job loss for employees who did not vote for the Union, that the Union created a secret "hit list" to threaten anti-Union employees, and that a small number of anti-Union employees' vehicles were vandalized around the time of the election.

The evidence indicates that rumors of termination for those who voted against the Union were unsourced, unconfirmed, and reached only a small number of employees. Such isolated rumors of job loss are not enough to create an atmosphere of fear and intimidation sufficient to undermine the results of an election.[2]

Con-way failed to present any solid evidence proving that any alleged "hit-list" existed. Only one employee claimed to have heard rumors of such a list. The evidence suggests that there were instead typical and permissible

---

[2] It is debatable whether such threats would make an employee more or less likely to vote for a union in the first place. After all, "alleged misrepresentation of mandatory union membership" might well "inure[] to the benefit of the Company rather than the Union." *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 31 (5th Cir. 1969). An undecided employee might find such strong-arm tactics unseemly or unsettling, for example, and might be inclined to vote against unionization for that reason.

campaign lists, used to gauge and track employee support for the Union prior to the election. Such lists do not impact the integrity of an election.

Four employees testified that, around the time of the election, their vehicles were vandalized. All four employees had been opponents of the Union. There is no evidence in the record identifying the vandals, however, and so the evidence of damage has limited probative value. *See NLRB v. White Knight Mfg. Co.*, 474 F.2d 1064, 1067 n.3 (5th Cir. 1973) ("The rule is well established that where the challenged conduct is not attributable to either of the parties it can be given  less weight than if the conduct were attributable to the parties themselves.").  There is also no evidence indicating that employees' votes were impacted by the vandalism. We acknowledge that vehicular vandalism is serious. Nonetheless, given the small number of incidents and the lack of evidence linking the vandalism to Union supporters, we conclude that the Board reasonably exercised its discretion in finding that the vandalism did not create an atmosphere of fear and intimidation such that employees were unable to freely cast their votes.

E.

Con-way lastly argues that the close vote, combined with all other evidence, mandates setting aside the election. "The closeness of the election is obviously relevant." *NLRB v. Gooch Packing Co.*, 457 F.2d 361, 362 (5th Cir. 1972). But "[t]he cumulative impact of a number of insubstantial objections does not amount to a serious challenge meriting a new election." *Lamar Co., LLC v. NLRB*, 127 F. App'x 144, 151 (5th Cir. 2005). The bulk of Con-way's objections are based on "isolated events involving unknown persons or other rank and file employees rather than Union representatives." *Hood Furniture*, 941 F.2d at 330. These objections, and the evidence Con-way offers in support, are insufficient to "make a prima facie showing that the atmosphere of free choice [was] destroyed by the alleged conduct." *Id.*

No. 15-60861

\* \* \*

There is no doubt that this election was imperfect. In particular, Martinez, the Union observer, acted unprofessionally inside the polling place. We do not condone this behavior. We do not, however, "sit to determine whether optimum practices were followed." *Avondale Indus., Inc. v. NLRB*, 180 F.3d 633, 637 (5th Cir. 1999) (internal quotation omitted). Rather, we determine "whether on all the facts the manner in which the election was held raises a reasonable doubt as to its validity." *Id.* (internal quotation omitted). Taken as a whole, the facts here do not raise "a reasonable doubt" as to the validity of this election.

IV

Con-way Freight's petition is DENIED. The Board's cross-application for enforcement is GRANTED.