# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 22, 2022

Lyle W. Cayce
Clerk

No. 21-60426

Exela Enterprise Solutions, Incorporated,

*Petitioner—Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent—Cross-Petitioner*,

On Petition for Review and Cross-Application
For Enforcement of an Order of the
National Labor Relations Board
NLRB No. 22-CA-272676

Before Stewart, Clement, and Elrod, *Circuit Judges*.

Edith Brown Clement:

Exela Enterprise Solutions, Inc. ("Exela"), seeks review of a National Labor Relations Board ("NLRB" or "Board") order finding that Exela violated the National Labor Relations Act ("NLRA") by refusing to bargain with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("Union"). The Board cross-petitions for enforcement. Because substantial evidence supports the Board's findings, we DENY Exela's petition for review and GRANT the Board's cross-petition for enforcement.

No. 21-60426

# I

Exela provides office services and facilities management at a Bristol-Myers Squibb warehouse in New Brunswick, New Jersey.  On March 29, 2019, the Board conducted a representation election at Exela's New Brunswick site.  Of fourteen eligible voters, eight employees voted for Union representation and six voted against it.

Exela filed timely objections to the conduct of the Union on the morning of the election and sought to set aside the results.  Following a hearing, a Hearing Officer of the NLRB recommended overruling each objection and certifying the Union as the exclusive collective-bargaining representative.  A Regional Director of the NLRB adopted the findings and recommendation and certified the Union.  The Board declined review.

Exela nevertheless advised that it would not engage in bargaining because it did not consider the Union to be the properly certified representative of its employees.  The Union filed an unfair labor practice charge with the NLRB.  The then-Acting General Counsel issued a complaint, asserting that Exela violated the NLRA by refusing to bargain in good faith with the Union.  *See* 29 U.S.C. § 158(a)(1), (5).  In its answer, Exela reasserted that the Union had been improperly certified.  It also raised an affirmative defense that the unfair-labor-practices complaint was *ultra vires* because the President unlawfully removed the former General Counsel without cause.

The Acting General Counsel moved for summary judgment, which the Board granted, finding that Exela failed to offer new evidence or special circumstances warranting review of the certification decision.  The Board declined to address the authority of the Acting General Counsel.  The Board's order required Exela to cease and desist from unfair labor practices, to bargain with the Union upon request, to embody any understanding

2

No. 21-60426

reached in a signed agreement, and to post appropriate notice. Exela petitioned this Court for review. The Board applied for cross-enforcement of its order certifying the Union as the exclusive collective-bargaining representative of Exela employees at the New Brunswick site.

## II

We begin with Exela's challenge to the unfair-labor-practice complaint issued against it by the then-Acting General Counsel. Exela contends that the prosecution was *ultra vires* because the President unlawfully removed the former General Counsel without cause. The Board declined to rule on the lawfulness of the General Counsel's removal, explaining: "Even assuming, arguendo, that the Board would have jurisdiction to review the actions of the President, we have determined that it would not effectuate the policies of the [NLRA] to exercise this jurisdiction." But the Board has since determined in another labor dispute that the Supreme Court's recent decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), "foreclosed any reasonable argument that the President lacked authority to remove [the] General Counsel." *Aakash, Inc.*, No. 32-CA-282957, 371 NLRB No. 46, at *2 (Dec. 30, 2021). Our review is *de novo*. *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001).

On his first day in office, President Biden took the unprecedented step of removing General Counsel Peter B. Robb without cause ten months prior to the expiration of his statutory term.[1] The President designated Peter Sung

---

[1] Although General Counsel Robert N. Denham resigned under presidential pressure in 1950, no General Counsel of the NLRB has previously been removed. *See* Ian Kullgren & Josh Eidelson, *Biden Fires NLRB General Counsel After He Refuses to Resign*, BLOOMBERG L. (Jan. 20, 2021, 8:42 PM), https://www.bloomberglaw.com/bloomberglawnews/daily-labor-report/XC87J9O000000.

No. 21-60426

Ohr as Acting General Counsel.[2]  Then-Acting General Counsel Ohr issued the unfair-labor-practice complaint against Exela.  Exela contends that the President's removal of General Counsel Robb was unlawful because the General Counsel of the NLRB enjoys the same protections from removal as the Members of the Board.  We disagree.

The Supreme Court recently affirmed the longstanding rule that "[w]hen a statute does not limit the President's power to remove an agency head, [courts] generally presume that the officer serves at the President's pleasure."  *Yellen*, 141 S. Ct. at 1782; *see also Shurtleff v. United States*, 189 U.S. 311, 315 (1903) (requiring "very clear and explicit language" in the statute, and not "mere inference or implication," to establish removal limitations).  Thus, we begin by reading the NLRA to determine if express statutory language insulates the General Counsel from removal.

Here, no provision of the NLRA protects the General Counsel of the NLRB from removal.  Whereas Congress clearly and unequivocally provided removal protections to the Board Members, it did not grant those same protections to the General Counsel.  The statute provides that the five Members of the Board shall be "appointed by the President by and with the advice and consent of the Senate . . . for terms of five years each," and "may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause."  29 U.S.C. § 153(a).  By contrast, in a separate provision, the NLRA creates the position of the General Counsel, who "shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years."  *Id.* § 153(d).  The provision is silent as to any tenure protections.  And no other provision in the NLRA limits the removal of the General Counsel.  We do not read Congress'

---

[2] The NLRA authorizes the President to temporarily fill a vacancy in the office of the General Counsel.  *See* 29 U.S.C. § 153(d).

silence as an invitation to graft onto the statute an otherwise absent for-cause limitation. Rather, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Yellen*, 141 S. Ct. at 1782 (quoting *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002)). Congress knew how to give removal protections to the General Counsel. And Congress chose not to do so.

Exela turns this logic on its head by arguing that we should compare the statutory language specifying the "grounds for Board member removal" with the absence of any removal provisions for the General Counsel. Therefore, Exela reasons, "if Congress wanted to enable the President to remove the Board's General Counsel mid-term, it would not have disparately excluded such language." This gets it exactly backwards. Congress cannot "enable" the President to exercise his removal powers. The President's power to remove derives from Article II of the Constitution, not from Congress. *See Myers v. United States*, 272 U.S. 52, 163–64 (1926).

Exela next argues that we should read the statutory language, "*shall* be appointed by the President, by and with the advice and consent of the Senate, for a term of four years," as curbing the President's removal power by providing for an absolute four-year term. *See* 29 U.S.C. § 153(d) (emphasis added). We disagree. As a textual matter, "shall" applies to the General Counsel's appointment and confirmation. It is not clear that "shall" also applies to the term-limit language. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152–53 (2012) ("[A] prepositive or postpositive modifier normally applies only to the nearest possible referent."). But even assuming that "shall" does apply to the statute's provision of a four-year term, the Supreme Court squarely

rejected that such language restricts the President's removal powers in a similar context over one hundred years ago.

In *Parsons v. United States*, the Court ruled on a challenge to the President's authority to remove a Senate-confirmed district attorney from his appointment eight months short of his four-year term. 167 U.S. 324, 327 (1897). Similar to the NLRA, the statutory language provided that district attorneys "*shall* be appointed for a term of four years." *Id.* at 327–28 (emphasis added) (quoting Rev. Stat. § 769 (1878)). The former district attorney argued that this language "gives to every district attorney the legal right to hold his office for four years, and that during that time the president has no power to remove him directly . . . [or] indirectly." *Id.* at 328. The Court disagreed. *Id.* at 338. It held that the statutory language, "shall be appointed," signified only that the district attorney's term would expire at the end of four years, not that he held "an unconditional term of office for that period. It was an act of limitation, and not of grant." *Id.* Similarly, here, the statutory language "shall be appointed . . . for a term of four years" only limits the General Counsel's term of office to four years and does not grant immunity from removal.

And we do not read *Parsons* as limited to its facts. In *Myers*, the Supreme Court affirmed a broad reading of *Parsons*. 272 U.S. at 141–43. There, the Court noted a tension between its holding in *Parsons* and its prior statement in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), that a justice of the peace's "appointment was not revocable" because "the law creating the office[] gave the officer a right to hold [it] for five years." *Myers*, 272 U.S. at 141 (quoting *Marbury*, 5 U.S. at 162). The Court held that, assuming its statement in *Marbury* "was more than a dictum," *Parsons* "overrule[d] it." *Id.* at 143. Thus, *Parsons* applies to all term-of-office provisions, including the one governing the General Counsel in the NLRA.

Taking a different tack, Exela argues that we should find removal protections implicit in the NLRA because the General Counsel is, "by virtue of its title and as evidenced by the responsibilities delegated to the position by the Board, . . . tantamount to a member of the Board." Exela fails to explain how the title of the General Counsel is "tantamount" to that of a Board Member. It is true that the statute refers to the "General Counsel *of the Board*" within a Section titled, "National Labor Relations Board." 29 U.S.C. § 153(d) (emphasis added). But, as a textual matter, that plainly does not make the General Counsel a *Member* of the Board. In the provision granting tenure protections to Board Members, the NLRA clearly and explicitly creates a Board of "five" members. *Id.* § 153(a). It does not say "some members of the Board," or "six members of the Board, including the General Counsel." The distinction between the General Counsel and Board Members is reinforced by the treatment of the two offices as distinct in the statutory provision for reappointment of "[e]ach member of the Board and the General Counsel." *Id.* § 154(a). That language would be redundant if we accepted Exela's reading of the statute. We are not persuaded that Congress would legislate in such an obscure manner when shielding the General Counsel from removal.[3]

The statutory text also undermines Exela's contention that the General Counsel's "responsibilities delegated to the position by the Board" render him "fully and inextricably linked to the Board itself." The NLRA

---

[3] The two positions are distinct in other ways too. They hold distinct terms— *compare* 29 U.S.C. § 153(a) (providing a five-year term to Board Members), *with id.* § 153(d) (providing a four-year term to the General Counsel)—and have distinct term limits on vacancy appointments—*compare id.* § 153(a) (providing that "any individual chosen to fill a vacancy [on the Board] shall be appointed only for the unexpired term of the member whom he shall succeed"), *with id.* § 153(d) (providing the President authority to temporarily fill a vacancy in the office of the General Counsel but limiting the term of acting service to forty days, with the possibility of a nomination-based extension).

creates a stark division of labor between the General Counsel and the Board. The statute created the Board to execute quasi-legislative, quasi-judicial functions. *See id.* § 156 (authorizing the Board to promulgate regulations); *id.* § 160(c) (authorizing the Board to adjudicate labor disputes). By contrast, the NLRA created the General Counsel to perform quintessentially prosecutorial functions, including the "exercise [of] general supervision" over officers and employees in the NLRB (excepting administrative law judges and legal assistants to the Board), "investigation of charges," "issuance of complaints," and "prosecution of such complaints."[4]  *Id.* § 153(d). As the Supreme Court has recognized, "[t]he words, structure, and history of the . . . NLRA clearly reveal that Congress intended to differentiate between the General Counsel's and the Board's 'final authority' along a prosecutorial versus adjudicatory line." *NLRB v. United Food & Com. Workers Union, Loc. 23*, 484 U.S. 112, 124 (1987). Thus, we do not find that the responsibilities of the General Counsel justify an inference of for-cause removal protection either.

Exela's citations to *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958), are misplaced. In *Humphrey's Executor*, the Court upheld removal protections for the Commissioners of the Federal Trade Commission because the Commission exercised "no part of the executive power," but rather, was "an administrative body" that performed "specified duties as a legislative or as a judicial aid." 295 U.S. at 628. The Court limited its holding "to officers of the kind here under consideration," *id.* at 632, meaning: "a multimember

---

[4] The NLRA also authorizes the General Counsel to perform "such other duties as the Board may prescribe." 29 U.S.C. § 153(d). But we recognize "[a] general limitation on the ability of the Board to delegate duties to the General Counsel[, which] lies in the distinction between prosecutorial duties and adjudicatory functions." *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 852 (5th Cir. 2010).

body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power," *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199 (2020). *Humphrey's Executor* does not assist Exela for three reasons. First, that case concerned a statute specifically providing removal protections. 295 U.S. at 623. Here, the parties ask us to read protections where Congress did not expressly include them. Second, *Humphrey's Executor* relied on the combination of explicit for-cause protection *and* a fixed term limit to uphold removal protections in the statute. *Id.* That situation is not before us. And third, the General Counsel is simply not an "officer of the kind" considered by the Court in *Humphrey's Executor*. The position is not judicial or legislative, but core to the executive function.

*Wiener* also does not support the implication of removal protections for the General Counsel. In *Wiener*, the Supreme Court applied the "philosophy of *Humphrey's Executor*" and inferred tenure protections for the Senate-confirmed members of the War Claims Commission ("WCC"). 357 U.S. at 356. The WCC was a multi-member, adjudicative body established by the War Claims Act of 1948 "to receive and adjudicate according to law" claims for compensation arising from World War II-related injuries or damage. 357 U.S. at 350 (quoting 50 U.S.C. § 4102). Although the Act did not expressly provide WCC members with tenure protections, the Court concluded that such protections were implicit in the statute. *Wiener*, 357 U.S. at 353–56. The Court reasoned that "the most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in" that officer. *Id.* at 353. Because the statute created the WCC to adjudicate claims according to law—"that is, on the merits of each claim, supported by evidence and governing legal considerations, by a body that was 'entirely free from the control or coercive influence, direct or indirect'"—the Court concluded that

9

Congress intended to protect members of the WCC from the President's removal power. *Id.* at 356–57 (quoting *Humphrey's Ex'r*, 295 U.S. at 629).

*Wiener*'s theory of implied removal protection is inapposite here for three reasons. First, the *Wiener* Court implied removal protections in the face of statutory language that was absolutely silent on the question. *See* 50 U.S.C. § 4102. *Wiener* relied on the logic that Congress must have intended to protect the WCC from at-will removal but simply did not address removal protections in the statute. 357 U.S. at 356. That logic does not hold here. Congress explicitly stated its intent to provide removal protections in the NLRA, but only with respect to the Board. *See* 29 U.S.C. § 153(a), (d).

Second, the General Counsel is not an adjudicative body like the WCC. Thus, the inference of tenure protection accorded to executive officers who perform duties of an "intrinsic[ally] judicial character" does not apply to the General Counsel. *Wiener*, 357 U.S. at 355. Rather, the General Counsel is more like the "purely executive officers" for whom the Supreme Court has held for-cause protections were unlawful. *Id.* at 352 (quoting *Humphrey's Ex'r*, 295 U.S. at 628); *see, e.g.*, *Yellen*, 141 S. Ct. at 1783; *Seila Law*, 140 S. Ct. at 2207.

And third, *Wiener*'s exclusive focus on the function of the executive officer predates *Morrison v. Olson*, in which the Supreme Court shifted the focus to "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." 487 U.S. 654, 691 (1988). Exela makes no argument that the absence of removal protections for the General Counsel impedes the President's Article II duties. But our implication of for-cause removal protections insulating the General Counsel's quintessentially prosecutorial function may "mean[] an unlucky President might get elected on [a labor-rights] platform and enter office only to find [himself] saddled with a holdover Director from a

competing political party who is dead set *against* that agenda." *Seila Law*, 140 S. Ct. at 2204.

Finally, Exela argues that we should imply removal protections for the General Counsel because of "Congress's intent that [the NLRB] function as an independent agency." The logic apparently being that the absence of removal protections allows for political motives to undermine the General Counsel's neutral investigation and prosecution of labor disputes. But that Congress created the NLRB as an independent agency does not license federal courts to read into the statute for-clause limitations that Congress did not expressly include. *Cf. Yellen*, 141 S. Ct. at 1782 ("Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership."). As discussed, federal courts "generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away.'" *Id.* at 1783 (quoting *Shurtleff*, 189 U.S. at 316). Congress may well have wanted to provide greater protection for the Members of the Board—who hold expansive quasi-legislative, quasi-judicial powers over labor rights disputes—than for the General Counsel.

The President's power to remove is essential to the performance of his Article II responsibilities and control over the Executive Branch. Because we hold that the NLRA does not provide tenure protections to the General Counsel of the Board, President Biden lawfully removed former-General Counsel Robb without cause. The prosecution brought by then-Acting General Counsel Ohr against Exela was proper.

### III

Now, we turn to Exela's contention that the Board improperly ruled that Exela violated Sections 8(a)(1) and (5) of the NLRA. We review representation proceedings for the limited purpose of deciding whether to enforce, modify, or set aside the Board's unfair-labor-practice order in whole

or in part. *See* 29 U.S.C. § 159(d). The Board's enforcement order turns on the validity of its earlier decision to certify the union. In turn, the certification order will be enforced if the Board's factual findings are "supported by substantial evidence on the record considered as a whole." *Id.* § 160(e). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *UNF W., Inc. v. NLRB*, 844 F.3d 451, 456 (5th Cir. 2016) (citation omitted).

We are guided by the "strong presumption" that representation elections "reflect the true desires of the employees." *NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 328 (5th Cir. 1991). Therefore, the party challenging the outcome "bears the entire burden of adducing prima facie facts sufficient to invalidate the election." *Id.* That showing requires "specific evidence of specific events from or about specific people" establishing a level of interference with employees' free choice that tended to or did materially influence the results of the election. *Con-way Freight, Inc. v. NLRB*, 838 F.3d 534, 537 (5th Cir. 2016) (citation omitted).

The Board's legal conclusions are reviewed *de novo*, and its procedural and evidentiary rulings for abuse of discretion. *UNF W.*, 844 F.3d at 457.

## A

First, Exela objected that the election should be set aside because an alleged agent of the Union, Fred Johnson, spoke with Exela employees during their shifts within twenty-four hours of the election, in violation of the Board's rule in *Peerless Plywood Co.*, 107 NLRB 427 (1953).

On the morning of the election, Wanda Rodriguez, an Exela employee, observed Johnson "huddling" with three eligible voters in the receiving area during their shifts. Johnson was an employee of Jones Lange LaSalle ("JLL"), a separate employer with employees also working at the New Brunswick site. As part of his job duties, he routinely picked up packages in

the receiving area, which is in a large, open warehouse space. Johnson also served as Union steward for a unit of JLL employees at the New Brunswick site.

Rodriguez told her supervisor, Jo Ann Lee, that Johnson was "huddled up with some of the staff." Lee then approached Johnson and asked if he needed help. He said that he had been looking for a package and eventually left without any packages. Neither Lee nor Rodriguez overheard the content of Johnson's discussion with the Exela employees.

Exela's objection is premised on Johnson's alleged status as an agent of the Union. The Union's responsibility for the acts of an agent is a question of fact governed by common law principles. *Poly-Am.*, 260 F.3d at 480. An agency relationship exists when an individual has either actual authority or apparent authority to act on behalf of another. *In re Cornell Forge Co.*, 339 NLRB 733, 733 (2003). The agency relationship "must be established with regard to the specific conduct that is alleged to be unlawful." *Id.* Here, that conduct was organizing an Exela bargaining unit for the Union. The Regional Director found no evidence in the record supporting the existence of an agency relationship. We agree.

Exela first contends that Johnson's role as Union shop steward for a unit of employees at JLL gave him actual authority on behalf of the Union, and that his title as president of the local affiliate of the Union "enhance[d] his agency status." But neither role conferred actual authority with respect to the Union's organizing of *Exela* employees.

Johnson's role in the local affiliate does not confer an agency relationship with the Union because international unions are independent legal entities from their local affiliates. *See In re Gen. Teamsters, Warehousemen & Helpers Union, Loc. 890*, 265 F.3d 869, 874–75 (9th Cir. 2001) ("[F]ederal labor law has steadfastly recognized the separation of the International from its local affiliate." (citing *United Mine Workers v. Coronado*

*Coal Co.*, 259 U.S. 344 (1922))).  Similarly, Johnson's title as Union shop steward for a separate employer does not, without more, confer an agency relationship for the purpose of the Exela organizing campaign.  While an alleged agent's position as steward of the bargaining unit at issue can be "probative," *Tyson Fresh Meats, Inc.*, 343 NLRB 1335, 1337 (2004), the Board has not given such weight to an alleged agent's position as shop steward *for a different employer*.  That is because an agency relationship must be established with respect to the alleged agent's duties and responsibilities implicating the labor dispute at issue.  Thus, the Board has rejected an employer's assertion that members of a union organizing committee were agents "simply by virtue of such membership."  *In re Cornell Forge*, 339 NLRB at 733.  More was needed, such as service "as the primary conduits for communication between the union and other employees" or "substantial[] involve[ment] in the election campaign in the absence of union representatives."  *Id.*; *see also Tyson Fresh Meats*, 343 NLRB at 1337 (finding union shop stewards were agents where they held labor negotiations with the bargaining unit at issue).

Here, the record does not reflect that Johnson had any involvement with the Exela organizing campaign.  And Exela presented no evidence that the Union otherwise vested Johnson with authority to organize an Exela bargaining unit.  But the record does support that Johnson was *not* an agent of the Union.  Brian Callow, a Union representative, testified that he and Arturo Archila were the only people assigned to the Exela organizing campaign.  And Clifford Gray, an Exela employee, corroborated this statement.[5]  The Board was justified in finding that Johnson did not have

---

[5] Exela contends that the Board abused its discretion when it credited Gray's testimony because Gray was purportedly (1) "evasive" when testifying about Johnson's stewardship role with JLL, and (2) biased by the outcome of the election.  Neither contention has merit.  The credibility findings of the Board are binding unless inherently unreasonable or self-contradictory.  *See UNF W.*, 844 F.3d at 457.  Because Exela does not

actual authority to act on behalf of the Union with respect to the Exela election.

As for apparent authority, the Regional Director concluded that no evidence supported that *the Union* created a perception that Johnson acted on its behalf with respect to the Exela bargaining unit. We agree.

"Apparent authority . . . results from a manifestation by a principal to a third party that another is his agent." *Loc. 9341, Commc'ns Workers of Am. (Pacific Bell)*, 304 NLRB 446, 446 n.4 (1991). "The test of agency in the union election context is stringent, involving a demonstration that the *union* placed the employee in a position where he appears to act as its representative." *Con-way Freight*, 838 F.3d at 538 (citation omitted). Even where an employee "engages in 'vocal and active' support[,] [he] does not become an agent on that basis alone." *Id.* (citation omitted).

Exela contends that Johnson was a Union representative based on Rodriguez's testimony that she "overheard people talking that [Johnson] was part of the Union." She did not identify the individuals that she overheard. Even assuming that Rodriguez's testimony means that she was under the impression that Johnson was a Union agent for the purpose of organizing an Exela bargaining unit—which is not at all clear from her testimony that Johnson was "part of the Union"—that impression must have resulted from the *Union*.[6] Rodriguez did not assert that her testimony was based on manifestations of the Union. Thus, the Board was also justified in finding

---

explain how Gray's testimony was "evasive" or why the election results would create bias, there is no basis to disturb the Board's credibility finding.

[6] The parties dispute whether the Regional Director dismissed Rodriguez's testimony as hearsay under Federal Rule of Evidence 801(c) or considered it for its effect on the listener. While the Regional Director found that the testimony was "based on [the] hearsay statements of unidentified declarants," he proceeded to consider the testimony for its effect on Rodriguez. Thus, the dispute is not genuine.

that Johnson lacked apparent authority to act on behalf of the Union with respect to the Exela election.

Because Johnson was not an agent of the Union, substantial evidence supports the Board's overruling of Exela's election objection.

**B**

Exela next contends that the Board abused its discretion when it overruled Exela's objection that two representatives of the Union stood near the polling site shortly before the polls opened.

The record reflects that Karen Brewer, Exela's Human Resources Business Partner and representative, convened at the polling site with the Union's two representatives—Callow and Archila—for a pre-election conference with the Board representative. According to Brewer, the Board agent told the representatives to go "far away" before the polls opened at 10:00 a.m. When Brewer left the polling site at 9:58 a.m. or 9:59 a.m., she observed Archila and Callow in the parking lot, approximately eighty feet from the entrance to the polling site. Archila was wearing a Union jacket. Callow testified that he smoked a cigarette and they left. The Board found that Callow "may have only taken a minute or two" to smoke.

According to Exela, the presence of Callow and Archila in the parking lot one or two minutes before the polls opened violated *Milchem, Inc.*, 170 NLRB 362 (1968). There, the Board established the bright-line rule that "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations." *Id.* at 362. But the prophylactic rule applies only "at the polling place itself or while the employees [are] waiting in line." *Bos. Insulated Wire & Cable Sys., Inc. v. NLRB*, 703 F.2d 876, 881 (5th Cir. 1983). Where those "precise factors are not present," *Milchem* is inapplicable. *Id.* Here, the record is devoid of evidence that Callow and Archila reentered the

voting area or had conversations with eligible voters, much less prolonged conversations. Exela does not claim that any voters were even present at the polling site—whether in the parking lot, voting area, or in line to vote—at the same time as the Union representatives. The Board reasonably concluded that the conduct was not objectionable under *Milchem*.

In the alternative, Exela argues that the Union violated the Board's multi-factor test under *Boston Insulated Wire & Cable Company*, which asks "whether the conduct, under the circumstances, 'is sufficient to warrant an inference that it interfered with the free choice of the voters.'" 259 NLRB 1118, 1118–19 (1982) (citation omitted), *enforced*, 703 F.2d 876 (5th Cir. 1983). Four factors guide the analysis: (1) "whether the conduct occurred within or near the polling place," (2) "the extent and nature of the alleged electioneering," (3) "whether it [wa]s conducted by a party to the election or by employees," and (4) "whether the electioneering [wa]s conducted within a designated 'no electioneering' area or contrary to the instructions of the Board agent." *Id.* at 1119 (internal citations omitted). The parties dispute the first, second, and fourth factors.

As to the first factor, the record reflects that Callow and Archila stood about eighty feet away from the election site, which the Hearing Officer found was "far-removed" from the actual polling area. In *C&G Heating & Air Conditioning, Inc.*, the Board concluded that the presence of a representative at a similar distance of seventy-seven feet away from the entrance to the polling site did not, on its own, interfere with the free choice of voters. 356 NLRB 1054, 1054–55 (2011). Thus, there is no basis to infer that the presence of the Union representatives three feet farther away than the agent in *C&G Heating* would interfere with voters' free choice.

Both the second and fourth factors turn on the threshold finding that the presence of the Union agents itself constitutes "electioneering." *Bos. Insulated*, 259 NLRB at 1119. Exela failed to present any evidence of

electioneering. The record does not establish that the representatives interacted with voters. Nor does the record reflect that any voters saw the representatives. While the prolonged, unexplained presence of a union or employer at the election site can be unlawful, the representatives in those cases stood within the immediate vicinity of voters after the polls opened. *See, e.g.*, *EDS-IDAB, Inc. v. NLRB*, 666 F.2d 971, 975–76 (5th Cir. Unit B 1982) (pro-union employee sat seven to eight feet away from voters); *Elec. Hose & Rubber Co.*, 262 NLRB 186, 216 (1982) (employer was continuously present ten to fifteen feet from the voting area). The mere presence of representatives far outside the entrance to the polling place, absent evidence of electioneering, is insufficient to warrant setting aside an election.

The Board was justified in overruling Exela's election objection.

\* \* \*

Because substantial evidence in the record supports the findings on which the Board based its certification decision, there is no basis to set aside the Board's order concluding that Exela violated Sections 8(a)(1) and (5) of the NLRA. We DENY Exela's petition for review, and GRANT the Board's cross-petition for enforcement.