In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2247

PRIMA TEK II, L.L.C.,

*Plaintiff-Appellant,*

*v.*

KLERK'S PLASTIC INDUSTRIES, B.V. AND
KLERK'S PLASTIC PRODUCTS MANUFACTURING, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 CV 583—**G. Patrick Murphy**, *Judge.*

ARGUED JANUARY 8, 2008—DECIDED MAY 5, 2008

Before FLAUM, RIPPLE, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* This case involves a licensing dispute between two companies that operate in the pot cover business. Prima Tek II ("PTII"), in essence, gave Klerk's Plastic ("Klerks") permission to use its technology to create superior pot covers in exchange for a royalty fee on each sale. The agreement between the parties delineated the type of product that Klerks was to sell, and it limited Klerks's ability to sell to particular entities in specified regions. PTII claims that Klerks breached this

agreement, and, in addition to damages, seeks to have Klerks held in contempt. The district court held that there were no material breaches of the licensing agreements, and that PTII failed to prove damages. We affirm.

## Background

In January of 1986, Klerks entered into a non-exclusive license agreement with Highland Supply Corporation ("Highland"). This agreement authorized Klerks to manu-facture and sell certain flower pot covers[1] subject to patents and patent applications in the United States and Holland. The two parties entered into a similar licensing agreement in 1987 authorizing Klerks to sell flower pot covers in Canada. Soon thereafter, Highland assigned its rights under the agreements to PTII. Both companies met on July 20, 2000, to discuss Klerks rights and obliga-tions under the licenses as certain patents were about to expire. Four days later, PTII filed suit seeking damages resulting from an alleged breach of the license agree-ments. The agreements generally control what types of pot covers Klerks can sell, to whom it can sell the covers, and where the covers can be sold.

On September 23, 2000, the parties arrived at an agree-ment where they amended the license agreements and

---

[1] Throughout the briefs and record, the parties refer to the objects at issue in this case as both "pot covers" and "plant covers." Pot covers and plant covers are obviously different, in that one covers pots and the other covers plants. Exhibits in the record seem to suggest that we are dealing with pot covers. However, for purposes of this opinion, we too will refer to pot covers and plant covers interchangeably, since the distinc-tion does not bear on the issues.

settled the litigation. After PTII filed a motion to enforce this settlement agreement, the trial court issued an order on April 5, 2001 (the "April 5 Order"), incorporating the settlement agreement and licenses and dismissing the lawsuit while maintaining limited jurisdiction to enforce its order. PTII thereafter alleged that Klerks had breached provisions of the licenses, and on October 22, 2001, the trial court granted PTII's request for post-judgment discovery. At that point, PTII terminated the licenses and Klerks stopped manufacturing and selling pot covers.[2]

The language of the licenses, which is in part what is at issue in this case, provides that:

> PTII hereby grants to KLERKS HOLLAND the non-exclusive license to manufacture and sell only in Holland and only in the United States UPGRADE PLANT COVERS only to CUSTOMERS under the trademark rights referred to in Article II and using or incorporating the technology referred to in paragraph 1.5 which are absolutely essential for KLERKS HOL-LAND to make and sell UPGRADE PLANT COVERS.

The term "customers" is defined as:

> (a) horticultural growers of potted plants for use on such potted plants and (b) retail food supermarkets. The term "retail food supermarkets" means a retail business whose entire business primarily is the retail sale of food products, that is, considering the total sales of the consolidated business, at least eighty percent (80%) of such sales are for food products. The term "CUSTOMERS" specifically (but not by way of

---

[2] It appears that Klerks actually ceased all manufacturing and selling of pot covers on June 21, 2002.

limitation) excludes EXCLUDED CUSTOMERS (defined below).

"Excluded customer" means:

> any customer who is not a horticultural grower of potted plants or a retail food supermarket. EXCLUDED CUSTOMERS specifically includes (but not by way of limitation) businesses such as variety chains, mass merchandisers, discount chains, drug chains, buying clubs, craft and hobby stores, garden centers, and home improvement centers such as (but not by way of limitation) Lowe's, Home Depot, Wal-Mart . . . whether or not marketed at retail store sites, central buying offices or via catalogs or via electronic means by a website or via any other marketing channel. KLERKS will not, to its best knowledge, sell plant covers to a CUSTOMER who resells those plant covers to an EXCLUDED CUSTOMER. KLERKS shall not (directly or indirectly) sell UPGRADE PLANT COVERS to anyone who is not a CUSTOMER and specifically cannot sell to any EXCLUDED CUSTOMERS.

In total, between April 5, 2001 (when the order was issued) and June 21, 2002, Klerks sold more than 30 million plant covers for a total of $4,805,627.16 in 1,736 different transactions. As a part of these transactions, Klerks paid PTII a total of $418,635 in royalties.

After completing its post-judgment discovery, on August 13, 2004, PTII filed a renewed motion urging the court to hold Klerks in contempt. PTII claimed that Klerks "knowingly manufactured, offered for sale [and] sold . . . (i) unlicensed plant covers, (ii) plant covers outside the licensed geographic territories, (iii) [to un]authorized

customers, and (iv) [incorrectly marked] plant covers . . . ." In addition to asking the court to hold Klerks in contempt, PTII also sought proceeds from any and all sales made in violation of the April 5 Order, settlement agreement, and licenses. The district court made a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) ruling in favor of Klerks. It held that PTII failed to meet its burden of producing clear and convincing evidence that Klerks should be held in civil contempt for violations of the April 5 Order. The district court also found that while Klerks did breach certain provisions of the license agreements, these breaches were not material, and PTII did not prove any damages that resulted from these breaches.

## Discussion

PTII raises three issues on appeal. First, it asserts that Klerks in fact did engage in material breaches of the license agreements attached to the April 5 Order. Second, with respect to these breaches, PTII maintains that it has shown damages with sufficient clarity. Third, it contends that Klerks should have been held in contempt for alleged violations of the April 5 Order. We analyze each issue in turn.

## A

PTII must prove by a preponderance of the evidence that Klerks breached the contract. *Austin v. Illinois*, 54 Ill. Ct. Cl. 375 (2002). We review "de novo a district court's determination of the meaning of an ambiguous contract term . . . as well as the court's factual findings following a bench trial." *Central States, Southeast and Southwest*

*Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 910 (7th Cir. 2000). PTII contends that the district court used the wrong standard in assessing whether a material breach occurred here. It argues that the court used a clear error standard instead of the required preponderance of the evidence standard. However, the trial transcript makes it clear that the district court understood that the contempt standard is clear error and the breach standard is preponderance of the evidence.[3] Moreover, apart from the district court's statement on what standard it used in its order, the record reflects—as the district court concluded—that PTII was not entitled to damages because it produced virtually no evidence of any material breaches or damages. This clears both standards.

To be sure, Klerks did breach portions of the agreement, but these breaches were not material. Specifically, its sales to Impack Corporation ($2,067), Dunstan AS Groome ($338.40), Kinney Bonded Warehouse ($303.74), Sea Venture Overseas ($60.21), and St. John's Shipping ($466.54) were made outside of authorized territories. Also, Klerks manufactured some nonconforming pot covers by improperly reversing the film in its machines. Such production, however, was promptly stopped. Overall, while some sales violated the terms of the license, more than 99 percent did not. There were no material breaches, and a party can only be held liable for damages resulting

---

[3] When orally addressing the parties during a hearing, the trial judge stated as follows: "Both parties have told me I can . . . award damages for . . . breach of contract irrespective of finding . . . contempt. Now, of course, the standard is entirely different. One is a mere preponderance of the evidence and one is clear and convincing."

from a material breach.[4] *Pacini v. Regopoulos*, 281 Ill. App.3d 274, 279 (1996) (finding no breach of an occupancy guarantee because 94.9953% occupancy rate was tantamount to a 95% occupancy rate); *Rubloff CB Machesney v. World Novelties*, 363 Ill. App.3d 558, 564 (2006) (listing several factors relating to a finding of materiality: 1) the extent to which the non-breaching party was deprived of the benefit that it reasonably expected; 2) the extent to which the non-breaching party can be adequately compensated for the part of that benefit of which it will be deprived; 3) the extent to which the breaching party will suffer forfeiture; 4) the likelihood that the breaching party will cure its failure; 5) the extent to which the breaching party's behavior comports with standards of good faith and fair dealing).

PTII tries to argue that Klerks breached the agreement in additional ways that the district court either overlooked or failed to appreciate. In each case, PTII either mischaracterizes the facts or uses faulty logic. First, it attempts to label several of Klerks's sales as sales to garden centers, which are excluded customers according to the agreement. However, PTII's own witness admitted that he had no evidence that the entities that they considered to be garden centers were anything other than horticultural growers of plants,[5] which are not excluded customers.

---

[4] A more significant hurdle for PTII is that it has not proven damages with sufficient clarity, as detailed below.

[5] The district court properly looked to the dictionary for guidance on defining "horticultural grower," (since it is not defined in the license) and found that it refers to an entity that cultivates a fruit or other product. This is more consis-

(continued...)

Second, PTII maintains that Klerks breached the license agreements by manufacturing and selling $2,762,459.66 of pot covers with "skirt angles" outside the specifications of the agreements. The license requires that "plant covers [have] the appearances and [be] made exactly like the samples covers Exhibits A (standard cover) and A1 (brite cover) attached hereto and made a part hereof, and with the skit extending upwardly and outwardly from the base at an angle from about 30 degrees to about 55 degrees from horizontal." More simply, visualize your everyday flower pot. In most cases, as you move further up the pot from bottom to top, it gets wider. The rate at which the pot widens—or the angle—is the "skirt angle." The district court found that the pot covers conformed to the skirt angle provisions. In addition, it found that these specific measurements were selected by the parties to reflect Klerks's existing manufacturing process, Klerks did not change this process, and PTII never complained about the skirt angles until after Klerks ceased making pot covers. What is essential to the dispute here is that each party has its own expert that claims that a particular method of measuring the skirt angle is superior. PTII's expert stated that he measured the angle at the intersection of the skirt and the base (the "break angle") and found many to be outside of the 30 to 55 degree range. Nevertheless, this expert agreed that there could be other ways to measure the angle, and Klerks's own expert measured the angles using a different method

---

[5] (...continued)
tent with the plain meaning of the term than PTII's proposed contextual definition, which narrowly defines the term as "large wholesale commercial growers."

(not just focusing on the break angle) and found them to be in compliance. Given the conflicting testimony, the fact that the licenses did not state a procedure for measuring the angles, that each expert offered a reasonable procedure, and both experts were well-qualified, it was reasonable for the district court to conclude that the skirt angles were within the permissible range.

Third, PTII asserts that Klerks sold $6,000 of lace plant covers in violation of the licenses. The district court held that the sales did not violate the licenses for two reasons. First, the license agreements incorporate a patent that permitted the production of lace covers. Second, the lace covers fit within the definition of "Upgrade B Plant Covers," which Klerks was permitted to sell. PTII argues that the 1986 license as amended does not grant Klerks permission to sell lace style covers because the patent is not included. Even if this were true—and it is not clear whether it is—PTII's argument still falls short because the lace covers appear to conform to the definition of Upgrade B Plant Covers. These covers are described as ones made from a non-matted polymer film, with a four-cornered skirt, "having a printed pattern only on the outside and with a solid color inside." Both parties agree that these covers have printed patterns on the outside. The question is whether the film has a solid color on the inside. The inside layer of these covers is clear, which is technically colorless. But the key idea is that the printed pattern is on the outside, not the inside, even though it can be seen from the inside because the inside layer is clear. Further, the fact that some of the printed pattern can be seen on the inside does not violate the license because the covers attached to the licenses shown as Exhibits B and B-1 have printed patterns

clearly visible from the inside of the pot cover. Thus, the district court did not commit any clear error in holding that the lace plant covers qualify as Upgrade B Plant Covers.

Fourth, PTII claims that the district court erred in holding that Klerks "did not use any Highland or PTII technology to make Sleeve products. In fact, neither Highland nor PTII . . . transferred any technology" to Klerks. Whether or not this finding is correct is irrelevant, because it was used to support two conclusions that PTII does not dispute. First, it was used to bolster the idea that plant sleeves (which Klerks now sells instead of pot covers) did not use any technology in violation of the agreements. Second, it was used to demonstrate that Exhibit X to the licenses was the only item of technology that PTII proved at trial was subject to the "return" provision of the licenses. The district court simply concluded that plant sleeves do not contain any Exhibit X technology, which PTII does not dispute. Moreover, PTII failed to prove that Klerks did not return any technology to it.

Finally, PTII makes a number of arguments with little to no support in the record. For instance, it nakedly asserts that Klerks made sales to non-supermarket retailers, which is not permitted, but it does not cite to anything in the record to support this point. In addition, PTII takes issue with the district court's conclusion that PTII failed to prove that Klerks made or sold any pot covers with a matted polymer film. The district court relied on its own observations and its own determinations with respect to the credibility of PTII's expert witness to arrive at this conclusion, and PTII does not offer any reason to doubt the correctness of its analysis.

PTII also disputes the district court's finding that Klerks did not materially breach an August 30, 2001 agreement because it shipped unlabelled covers from September 4 through September 12, 2001. Pursuant to the agreement, the covers had to be marked with a label as prescribed by PTII. But PTII made compliance difficult, in that it kept switching the labeling requirements, which cost Klerks almost $500,000. Given the cost and time associated with meeting PTII's mercurial demands, the agreement stated that Klerks could ship unmarked covers through September 4th. Klerks went over by eight days. The district court did not abuse its discretion in declaring that this was not a material breach, especially since PTII did not suffer any identifiable harm.

**B**

Even if PTII could somehow show a material breach, it would still fall short of winning on its claim because it has not proven damages. PTII makes two arguments here. First, it contends that it should have been awarded nominal damages even if it could not prove actual damages. Second, it argues that it did in fact prove actual damages. With respect to the first point, Illinois law is clear: "[m]erely showing that a contract has been breached without demonstrating actual damages dose not suffice . . . to state a claim for breach of contract." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007). More importantly, PTII never sought *damages* from Klerks—it only sought to require Klerks to "disgorge" the entire proceeds of every sale it contend was in violation of the licenses (plus treble damages and attorneys' fees).

With respect to the second point, Illinois law is again clear: damages for unjust enrichment are not awardable

when, as here, there is a contract between the parties on the subject in dispute. *La Throp v. Bell Fed. Sav. & Loan Assoc.*, 68 Ill.2d 375, 391 (1977). PTII did not prove in its proceedings below that it lost any sales, profits, or royalty income as a result of the alleged violations, and it provided no proof that any of the violations damaged its business in any concrete way. Indeed, PTII does not actually *make* anything—its business is to license and collect royalties from sales made by others. And we know from the record that Klerks paid royalties on every sale. PTII could claim that it would have given the license to another party that could have made sales, but it provides no evidence to show that its royalties would have been any higher.

In the alternative, PTII submits that this court should fashion an equitable remedy and award Klerks's gross sales as a measure of damages. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932); *Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir. 1988). But what PTII does not recognize is that in cases where such a remedy has been crafted, the court also found the breaching party in contempt, which is not the case here. Klerks's breaches were not material, and there is no suggestion that it did not deal with PTII in good faith.

Both Klerks and the district court posit that PTII suffered no theoretical damages—and actually gained—from the breaches that were alleged to have occurred because royalties were paid on each transaction. This is not accurate. If we suppose, for instance, that Klerks did actually manufacture covers with angles outside the permissible range, then it does not follow that PTII only benefitted because it was still paid a royalty on the transactions. This is because PTII could have made additional

revenue by forcing Klerks to pay a higher fee for a less restrictive angle range. In addition, the cost of losing control over whom the licensee can sell to and where they can sell implicates market share and quality control issues.[6] All of these types of harms are capable of being made concrete. Unfortunately for PTII, it was unable to prove any material breaches, or any concrete damages that flowed from these breaches. *Transportation & Transit Assocs., Inc. v. Morrison Knudsen Corp.*, 255 F.3d 397, 401 (7th Cir. 2001) ("the party claiming the breach must establish the amount of damages. The demonstration need not be precise, . . . but the plaintiff must have a sensible basis for its claim.").

## C

We do not disturb a district court's decision regarding a contempt petition unless we find that it abused its discretion. *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989). Put another way, we "must affirm if the district court's determination is plausible in light of the record in its entirety." *Zeige Distrib. Co., Inc. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995) (citations omitted).

---

[6] Even beyond harms to the particular licensor, there is a social loss associated with reading licenses in an overly liberal manner. Interpreting licenses loosely could lead to higher degrees of uncertainty with respect to a licensor's ability to carve up markets, which in turn could push up the price of licenses as a whole. In addition, companies like PTII would be less inclined to innovate and create new technology if they could not properly define the contours of precisely what their licensees can do with the technology.

Contempt is a unique civil sanction because its aim is both coercive and compensatory. *U.S. v. United Mine Workers*, 330 U.S. 258, 303-04 (1947).[7] To sustain its contempt claim, PTII has the burden of proving all of the following elements by clear and convincing evidence: (1) the Order sets forth an unambiguous command; (2) Klerks violated that command; (3) Klerks's violation was significant, meaning it did not substantially comply with the Order; and (4) Klerks failed to take steps to reasonable and diligently comply with the Order. *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995); *Stotler*, 870 F.2d at 1163.

Starting with the last prong, it is pellucid that Klerks took reasonable and diligent steps to comply with the April 5 Order. Indeed, shortly after the Order was issued, Klerks's management met with its attorneys to review its rights and responsibilities. It instituted policies that were more restrictive than the licenses themselves.[8] It also held quarterly meetings to review compliance issues. Klerks communicated these policies internally and externally, and conducted meetings with sales staff and its customer service department to inform them of restrictions. It even went so far as to directly inform its customers and distributors of the restriction limiting sales of pot covers to horticultural growers and retail food supermarkets. This list is meant to be illustrative—it is by no means exhaustive. PTII's sole counter-

---

[7] The coercive element is not in play here because, as noted earlier, Klerks is no longer in the plant cover business.

[8] For instance, Klerks decided that it would not sell pot covers to any grower who is using the pot covers on plants that would be sold to mass merchandisers.

argument here is the evidence that it offers that suggests that some of Klerks's employees (e.g., salesmen) were not aware of some of the new policies that Klerks implemented in order to ensure compliance. While this is indeed countervailing evidence, on balance, it does not add up to a finding that the district court abused its discretion in concluding that Klerks took reasonable and diligent steps to comply with the April 5 Order.

With respect to the third prong, PTII is unable to prove by clear and convincing evidence that Klerks failed to substantially comply with the April 5 Order. The parties disagree as to how many of the 1,736 transactions at issue contravene the Order. As explained in greater detail above, some of these transactions indeed did not comply. However, we ultimately agree with the district court that "[t]he quantity of nonconforming pot covers sold is a fraction of 1% of total pot cover sales by Klerks."

With respect to the first two prongs, PTII again fails to prove by clear and convincing evidence that Klerks violated an unambiguous command contained in the April 5 Order. The district court correctly found that on a number of issues (e.g., sales of matted covers, lace covers, etc.) that PTII did not meets its burden. In addition, the order must be *unambiguous*, which is not the case here with respect to definitions of "customers" and "excluded customers." For instance, PTII forbade the sale of plant covers to a customer who then resells the plant cover (even if it is on a potted plant) to an excluded customer. The problem with this position is that it would render the entire April 5 Order useless, because it would preclude Klerks from selling plant covers to horticultural growers and retail food supermarkets since they themselves then sell to individuals (i.e., the ultimate end-users), who are

excluded customers. Klerks interpretation of "resells" is more reasonable, in that it refers only to resales of the plant covers alone, not resales of the plant covers attached to potted plants.

Notwithstanding PTII's inability to meet the standards set out for holding a party in contempt, we have held that remedial sanctions are limited to provable losses sustained by the non-breaching party as a result of the violation of the order. *Autotech Techs. LP v. Integral Research and Dev. Corp.*, 499 F.3d 737, 752 (7th Cir. 2007). As we have explained above, PTII failed to prove any such loss.

### Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.