In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 18-1774
NATIONAL LABOR RELATIONS BOARD,
 Petitioner,
 v.

NEISES CONSTRUCTION CORPORATION,
 Respondent.
 ____________________

 Petition of the National Labor Relations Board for an Adjudication in
 Civil Contempt, Assessment of Noncompliance Fines and Other
 Requested Civil Relief.
 No. 13-CA-210180.
 ____________________

 DECIDED MARCH 10, 2023
 ____________________

 Before RIPPLE, ROVNER, and WOOD, Circuit Judges.
 RIPPLE, Circuit Judge. Neises Construction Corporation re-
fuses to bargain in good faith with the Indiana/Ken-
tucky/Ohio Regional Council of Carpenters (“the Union”),
which represents its employees. We have ordered Neises to
2 No. 18-1774

 1
bargain with the Union three times. Despite these orders,
Neises’s contumacious conduct persists. After reaching nu-
merous tentative agreements on the articles to be included in
a collective bargaining agreement with the Union, Neises re-
tracted those tentative agreements without good cause. The
National Labor Relations Board then sought to hold Neises in
contempt for refusing to bargain with the Union in good faith.
We appointed a Special Master to resolve the parties’ factual
disputes. After more than a year of discovery, motions prac-
tice, and deliberation, the Special Master found, by clear and
convincing evidence, that Neises should be held in contempt.
The Special Master’s Report and Recommendation is sound,
and Neises’s objections are unpersuasive. We hold Neises in
 2
contempt. As explained in detail below, we impose most of
the Board’s proposed sanctions, including a $192,400 ﬁne.
 I.
 A.
 This case began in 2018 when the Board sought, and ob-
tained, from this court enforcement of its order requiring
Neises to recognize and to bargain with the Union. In May
2019, the Board sought to hold Neises in contempt for failing
to bargain with the Union. We entered a consent order that
required Neises to bargain with the Union not less than once

1 We refer to appellate docket entries as “App. Dkt. ___.” We refer to the
Special Master’s Docket as “SM Dkt. __.”
2 On January 6, 2023, we issued an order that overruled Neises’s objections
to the Special Master’s Report and Recommendation and adjudicated
Neises in contempt. See App. Dkt. 65. In that order, we explained that we
would issue a full opinion after we considered and decided the matter of
an appropriate remedy. We now issue this opinion.
No. 18-1774 3

every thirty days. In February 2020, the Board again sought to
hold Neises in contempt for failing to bargain with the Union
as required; we again entered a consent order that required
Neises to bargain with the Union at least once every thirty
days.
 In April 2021, the Board sought to hold Neises in contempt
for a third time. The Board alleged that while the previous
consent order was under submission, Neises and the Union
engaged in productive discussions and came to tentative
agreements on many aspects of a collective bargaining agree-
 3
ment. But Neises effectively retracted those tentative agree-
ments when it hired a new attorney who refused to adhere to
them. Specifically, after the Board filed its February 2020 con-
tempt petition, Neises retained attorney Francis Jaskowiak to
defend it against the contempt petition and to represent it
during collective bargaining. While the contempt petition was
pending, the parties resumed bargaining with Attorney
Jaskowiak as Neises’s lead negotiator. The parties met five
times between March 2 and May 28, 2020. These meetings re-
sulted in tentative agreements on most of the articles to be in-
cluded in a final collective bargaining agreement.
 Two agreements produced in discovery by Neises reflect
these tentative agreements. Most relevant is a document la-
beled “Exhibit QQ.” It reflects, as Mr. Jaskowiak confirmed,
the “current status of [the tentative agreements] after

3 The petition says that this bargaining happened “[i]mmediately follow-
ing entry of the 2020 consent order.” App. Dkt. 24 at 6. In fact, the bargain-
ing happened during several sessions before the 2020 consent order was
entered. The Board corrected this statement in its amended petition. SM
Dkt. 26 ¶ 16.
4 No. 18-1774

 4
completion of [the] May 28, 2020 negotiations.” This docu-
ment includes (1) tentative agreements (written in normal
text), (2) Union proposals for open articles or sections (high-
lighted in green), and (3) company proposals for open articles
or sections (highlighted in yellow). An earlier version of the
tentative agreements, dated May 14, 2020, is highlighted in
various colors with initials next to some tentatively agreed-
upon provisions.
 The tentative agreements also are reflected in a draft of the
collective bargaining agreement produced by the Board dur-
ing discovery. This document, created by the Union for a bar-
gaining session scheduled for June 26, 2020, contains the par-
ties’ tentative agreements (reflected in normal text) and the
Union’s proposals (highlighted in green). We refer to this doc-
ument as the Union version of the tentative agreements.
 The Union version and Exhibit QQ have two relevant dif-
 5
ferences. First, the Union version suggests that the parties
reached a tentative agreement on Article XV, “Duration,
Amendment and Termination”; Exhibit QQ does not. But the
Union repeatedly said this was a mistake and informed
Neises that it did not believe that Article XV was part of the

4 App. Dkt. 55 at 82; SM Dkt. 67-6 at 90–93.

5 We say “relevant differences” because Neises also complains that the
documents differ concerning the parties’ proposals on open articles and
sections. But this is a red herring. What matters is whether there are dif-
ferences in terms to which the parties had tentatively agreed, not differ-
ences over terms that had not yet produced any agreement.
No. 18-1774 5

 6
tentative agreements. Second, the Union’s version includes a
 7
sentence in Article II that does not appear in Exhibit QQ.
 Negotiations broke down at the June 26 bargaining session
 8
(held just days after we entered a consent order in June 2020).
Attorney Robert Hanlon replaced Mr. Jaskowiak as Neises’s
lead negotiator, and he informed the Union’s representatives
that he had significant problems with the parties’ tentative
agreements. He insisted on reading his proposed revisions
 9
aloud. After some back and forth, the Union asked to resume
bargaining about two weeks later, on July 8, and asked
Mr. Hanlon to present his proposals in writing. The Union
also sent Mr. Hanlon a copy of the tentative agreements, its
 10
proposals, and its standard contract language.
 Two days before the scheduled follow-up meeting, the
Union again asked Mr. Hanlon to send his proposals in writ-
ing. He refused, saying he would only provide the proposals
at the meeting. The Union responded that it would not meet
without having a copy of Hanlon’s proposals and an

6 See, e.g., SM Dkt. 69-3 at 33 (noting the Union told Neises that “duration”
was an open consideration); SM Dkt. 67-6 at 742 (same); SM Dkt. 72-2 at
6 n.1 (stating that the Union informed Neises several times that Article XV
was an open article).
7 Compare App. Dkt. 52-4 at 5 (final sentence of Article II, Section 3), with
App. Dkt. 52-3 at 4–5 (no such sentence).
8 SM Dkt. 70-1 at 14–17; SM Dkt. 67-6 at 2–3.

9 SM Dkt. 67-6 at 3–5, 189.

10 SM Dkt. 70-1 at 18.
6 No. 18-1774

assurance that Neises would honor the parties’ tentative
 11
agreements. When Mr. Hanlon again refused, the Union
canceled the meeting. Mr. Hanlon nevertheless showed up
and demanded the Union pay for expenses incurred in at-
tending the canceled meeting.
 On August 4, the parties met, and, although Mr. Hanlon
again had refused to provide the proposals in advance, he
provided his proposals in writing at the meeting. That docu-
ment included all the tentative agreements found in Exhibit
 12
QQ but proposed many changes. For instance, Mr. Hanlon
proposed charging the Union $50 per employee, per pay pe-
riod, to collect and remit Union dues, even though the parties
 13
already had agreed that Neises would do so without charge.
The Union rejected the proposals as “regressive,” “outland-
 14
ish,” and not made in good faith. Mr. Hanlon maintained
that his proposals were reasonable and asked to continue bar-
gaining; the Union refused to continue bargaining until
Mr. Hanlon committed to the tentative agreements and with-
 15
drew his new proposals.
 Over the next twelve months, Neises continued to propose
dates to bargain. The Union refused to bargain until Neises

11 SM Dkt. 65-4 at 8, 17.

12 SM Dkt. 67-5 at 26–58.

13 Compare App. Dkt. 52-3 at 4–5, with App. Dkt. 57 at 43.

14 SM Dkt. 70-1 at 26.

15 SM Dkt. 92 at 5.
No. 18-1774 7

committed to bargain in good faith and honor the tentative
 16
agreements as they existed on June 26, 2020.
 After the Board’s Office of General Counsel investigated
this matter, then-General Counsel Peter Robb directed his
 17
staff to file the contempt petition. Before it was filed, how-
ever, President Biden, upon assuming office, discharged
Mr. Robb and appointed Peter Ohr as Acting General Coun-
sel. While Mr. Ohr was in office, the petition was filed on
April 12, 2021. We referred the petition to a Special Master.
 Before the Special Master, Neises argued that Mr. Robb
was fired unlawfully and that filing the contempt petition
while Mr. Ohr was acting as general counsel constituted an
ultra vires act. In response, General Counsel Jennifer Abruzzo
 18
and the full Board ratified the contempt petition.
 After reviewing the evidence, the Special Master con-
cluded that the Board had proven by clear and convincing ev-
idence that Neises should be held in contempt. He rejected
Neises’s argument that filing the petition was an ultra vires
act because General Counsel Abruzzo had ratified the filing
and Neises had offered no evidence to overcome the pre-
 19
sumption of regularity. The Special Master then found that
all four elements of civil contempt were met. Those elements
are: 1) an unambiguous command, 2) a violation of the

16 SM Dkt. 65-2 at 11; SM Dkt. 65-4 at 54.

17 SM Dkt. 67-6 at 766.

18 See SM Dkt. 15-1; SM Dkt. 22-1.

19 He also noted that the Board itself ratified the petition too. See SM Dkt.
22-1.
8 No. 18-1774

command, 3) a significant violation, and 4) a lack of reasona-
ble and diligent efforts to comply. See Prima Tek II, LLC v.
Klerk’s Plastic Indus., 525 F.3d 533, 542 (7th Cir. 2008). Specifi-
cally, he determined that our 2020 judgment and consent or-
der unambiguously command Neises to bargain in good
faith. He next determined that Neises violated that command
by, among other things, retracting without good cause nu-
merous tentative agreements that were to be included in a fi-
nal collective bargaining agreement. Last, he found that
Neises did not comply substantially with its obligation to bar-
gain in good faith or make reasonable, diligent efforts to do
so.
 B.
 The basic issue before us is whether Neises significantly
violated an unambiguous command to bargain in good faith
with the Union by retracting, without good cause, the aspects
of the collective bargaining agreement to which it tentatively
had agreed. The record clearly and convincingly establishes
that Neises disobeyed our order.
 Neises offers three broad objections, but none are persua-
sive. First, it says that the Board did not have authority to file
the contempt petition and that the petition was not properly
ratified. Second, it asserts that the Report improperly decided
that the parties reached tentative agreements. Finally, Neises
argues that it did not violate an unambiguous command be-
cause this court’s February 2020 judgment and consent order
do not use the phrase “in good faith” and such a phrase is too
vague anyway.
 We review de novo the Special Master’s legal conclusions
and all facts found without an evidentiary hearing. See Polish
No. 18-1774 9

Nat’l All. v. NLRB, 159 F.2d 38, 39 (7th Cir. 1946) (applying
Federal Rule of Civil Procedure 53 by analogy); cf. Colorado v.
New Mexico, 467 U.S. 310, 317 (1984) (noting that the Supreme
Court independently reviews a Special Master’s legal and fac-
tual conclusions). Here, the parties filed cross-motions for
summary judgment based on the papers before the Special
Master but did not seek an evidentiary hearing. We therefore
have reviewed independently the record to determine
whether, based on the undisputed evidence, there is clear and
convincing evidence that Neises committed a significant vio-
lation of an unambiguous command without taking reasona-
ble and diligent steps to comply with our order. Prima Tek II,
525 F.3d at 542.
 Neises’s first argument need not detain us long. It main-
tains that there is no valid contempt petition here because the
President unlawfully removed General Counsel Robb. We
need not reach the merits of this argument because the five-
member Board, on whose behalf the petition is filed in the first
place, see 29 C.F.R. § 101.15, formally endorsed seeking con-
tempt here. Even so, we are mindful that other courts have
recently rejected the same argument that Neises raises here.
See Exela Enters. Sols. v. NLRB, 32 F.4th 436, 441 (5th Cir. 2022);
NLRB v. Aakash, Inc., 58 F.4th 1099, 1103 (9th Cir. 2023).
 Neises’s second argument is that the Special Master erred
by deciding that Exhibit QQ contained the parties’ tentative
agreements because there are material differences between
Exhibit QQ and the Union’s version of the tentative agree-
ments. We cannot accept this submission. The documents are
essentially the same; the two differences are immaterial. First,
Article II, Section 3 has an extra sentence in the Union’s ver-
sion: “The Employer agrees to accept the current Union
10 No. 18-1774

authorization cards to demonstrate employee’s authorization
of payroll deductions to include but not limited to: dues, as-
sessments, C.O.P.E., market recovery, and vacation savings.”
Second, the Union’s version of Article XV indicates the par-
ties’ tentative agreement; Exhibit QQ does not.
 The extra sentence in Article II, Section 3 does not create a
material dispute over the essential agreement expressed by
that provision. Nor does it place in doubt that Neises retracted
that essential agreement. Article II, Section 3 provides that
Neises would, upon an employee’s authorization, deduct Un-
ion dues and remit them to the Union. The contested sentence
describes how an employee could demonstrate that the em-
ployee authorized the deduction. To the extent that Neises
complains that there is no evidence it tentatively agreed to
this sentence, the Special Master found, and we agree, that the
sentence was not part of the parties’ tentative agreements. But
a one-sentence discrepancy in a thirteen-page document does
not cast serious doubt on the remainder of the parties’ tenta-
tive agreements. In any event, Neises’s August 4 proposal ef-
fectively retracted the parties’ agreement on this point; it spe-
cifically proposed charging $50 per Union employee, per pay
period, for deducting Union dues. That proposal eviscerated
the parties’ prior agreement that Neises would deduct Union
dues without charge, irrespective of how an employee au-
thorized the deduction.
 Nor is there a material factual dispute over Article XV.
There is no serious doubt whether the parties tentatively
agreed to these provisions; they did not. The Union’s repre-
sentatives repeatedly told Neises that the agreement’s dura-
tion was open to negotiation. And, as the Special Master
No. 18-1774 11

correctly found, Neises’s own Exhibit QQ accurately reflects
that Article XV was open for negotiation.
 Neises’s final argument is that the version of the tentative
agreements from May is the best reflection of the parties’ ten-
tative agreements. This is so, in Neises’s view, because the
draft from May contains tentative agreements with handwrit-
ten initials next to various provisions. But this argument
simply ignores Mr. Jaskowiak’s testimony that Neises’s Ex-
hibit QQ reflected the terms to which the parties had tenta-
tively agreed. And as the Board points out, the parties did not
establish any ground rules about initialing agreed-upon pro-
posals or require that the parties would initial tentative agree-
ments. Thus, the presence or absence of initials does not con-
trol.
 The Special Master decided correctly that the parties
reached tentative agreements on many articles to be included
in the collective bargaining agreement. He rightly determined
that Exhibit QQ accurately reflects the parties’ tentative agree-
ments.
 C.
 Neises next makes three arguments why it should not be
held in contempt for refusing to bargain in good faith with the
Union. First, it submits that it could not have bargained in bad
faith because of the differences between the two versions of
the tentative agreements. Second, it contends that the Board
failed to demonstrate that Neises was required to bargain in
good faith. Third, an order to bargain in good faith is an im-
permissibly overbroad, obey-the-law command.
12 No. 18-1774

 1.
 Neises submits that it did not bargain in bad faith when it
rejected the Union’s version of the tentative agreements be-
cause the Union’s version was substantially different from
Neises’s version. But, as we already have noted, this argu-
ment must fail because the two versions are materially iden-
tical. If Neises’s refusal to bargain were limited to Article II,
Section 3, or Article XV, it may have had good cause to pro-
pose altering those tentative agreements. But that did not hap-
pen here. Neises reversed its position on matters unrelated to
these two minor discrepancies. Its argument that it did not
bargain in bad faith because of these two differences is simply
a post-hoc excuse that it never presented to the Union as a
reason to renegotiate.
 Neises next argues that it did not bargain in bad faith be-
cause its proposals were necessitated by an economic down-
turn caused by the COVID-19 pandemic. It relies on Chicago
Local No. 458-3M, Graphic Communications International Union
v. NLRB, 206 F.3d 22, 29–31 (D.C. Cir. 2000), for the proposi-
tion that changed economic conditions present good cause for
renegotiation of tentative agreements. But, as the Board notes,
this argument also appears to be a post-hoc excuse because
Neises never told the Board or the Union that it needed to re-
negotiate terms for this reason. Neises makes no effort to ex-
plain why changed economic conditions would support re-
tracting tentative agreements over noneconomic terms.
 Neises’s final argument that it did not bargain in bad faith
is that the Special Master erred when he decided that Neises
effectively eviscerated the parties’ tentative agreements.
Neises says it merely “made proposals in response to the
No. 18-1774 13

Union’s June 26 proposals” 20 on mandatory bargaining sub-
jects. But Neises did not simply propose terms for open arti-
cles or sections, it reneged on the parties’ tentative agree-
ments, which is evidence of bad faith. See Polycon Indus., Inc.
v. NLRB, 821 F.3d 905, 907 (7th Cir. 2016); Am. Seating Co. of
Miss. v. NLRB, 424 F.2d 106, 108 (5th Cir. 1970). For instance,
after the parties agreed that Neises would deduct Union dues
without fee, Neises proposed charging $50 per employee, per
pay period. After the parties agreed that the workday would
not begin before 6:00 am and would include two, paid ten-
minute breaks and an unpaid thirty-minute lunch break,
Neises proposed a new start time and eliminating the paid
breaks. After the parties agreed that a workweek would be
forty hours, Monday through Friday with Saturday as a
makeup day, Neises proposed that the workweek would run
Monday through Saturday and that it could institute shift
 21
work or ten-hour days at its discretion.
 The Special Master highlighted two additional indicia of
bad faith; Neises ignores both. First, the Special Master noted
that Neises proposed a management’s-rights provision that
evidenced bad faith because it would bar the Union from tak-
ing part in decision making about Union members’ working
hours and conditions. See Frankl v. HTH Corp., 650 F.3d 1334,
1359 (9th Cir. 2011) (noting that a virtually unlimited manage-
ment’s-rights clause indicates bad faith). Second, Neises pro-
posed a grievance procedure that would make the arbitrator
liable to the dissatisfied party, which, noted the Special

20 App. Dkt. 55 at 29.

21 See App. Dkt. 38-2 at 10–12 (listing these and other retractions).
14 No. 18-1774

 22
Master, “is essentially no procedure at all.” Moreover,
Neises offered these proposals even though the parties al-
ready had reached tentative agreements on both subjects.
 2.
 Neises’s second argument why it should not be held in
contempt is that the Board failed to prove that our 2020 judg-
ment and consent order required Neises to bargain in good
faith. Contempt requires the court to find that the party vio-
lated an unambiguous, specific command. Prima Tek II, 525
F.3d at 542; Ferrell v. Pierce, 785 F.2d 1372, 1378 (7th Cir. 1986).
Neises argues that our orders do not give it “‘explicit notice’
of ‘what conduct is outlawed,’” Taggart v. Lorenzen, 139 S. Ct.
1795, 1802 (2019) (quoting Schmidt v. Lessard, 414 U.S. 473, 476
(1974) (per curiam)), because the 2020 judgment and consent
order do not use the phrase “in good faith.”
 Taggart holds that civil contempt is appropriate “if there is
no fair ground of doubt as to whether the order barred” the con-
duct at issue. Id. at 1799. Our 2020 consent order requires
Neises to comply fully with the order and judgment we had
entered in May 2018. There are two relevant provisions in that
judgment: (1) Neises must “bargain with the Union,” and
(2) Neises must “cease and desist from failing and refusing to
recognize and bargain” with the Union or “in any like or re-
lated manner interfering with, restraining, or coercing em-
 23
ployees.”

22 App. Dkt. 38-2 at 13.

23 App. Dkt. 2-2 at 2 (cleaned up); see also App. Dkt. 21-2 at 7 (requiring
the same).
No. 18-1774 15

 There is no fair ground of doubt that our orders required
good-faith bargaining. A command to bargain necessarily en-
compasses an order to engage in genuine efforts to reach an
accord. See, e.g., NLRB v. Ins. Agents Int’l Union, 361 U.S. 477,
485 (1960); NLRB v. Overnite Transp. Co., 938 F.2d 815, 821 (7th
Cir. 1991). Otherwise, as the Special Master pointed out,
Neises could attend bargaining sessions and propose illegal
terms without violating this court’s orders. Parties must make
reasonable efforts to comply with our orders, not engage in
crafty feints designed to avoid court-imposed obligations.
McComb v. Jacksonville Paper Co., 336 U.S. 187, 192–93 (1949);
Am. Fletcher Mortg. Co. v. Bass, 688 F.2d 513, 517 (7th Cir. 1982).
Neises’s prior submissions demonstrate that it understood its
obligation. Indeed, in response to an earlier contempt petition
in this case, Neises responded that “it should not be held in
contempt … because it met and bargained with the Union in
good faith … . The Judgment required good faith bargaining ‘upon
 24
request’ by the Union.”
 Neises nevertheless maintains that good-faith bargaining
is too opaque a concept to form the basis of a contempt order.
It points out that the Board’s website lists more than fifty ex-
amples of what good-faith bargaining might include. But this
observation misses the point. The Special Master did not de-
termine that Neises failed to engage in specific acts that might
qualify as good-faith bargaining. Rather, he concluded that
Neises engaged in a course of conduct designed to subvert the
possibility of reaching an agreement. It did so by offering re-
gressive modification of tentative agreements, proposing ob-
viously preposterous terms, suggesting a management’s-

24 App. Dkt. 15 at 2 (emphasis added).
16 No. 18-1774

rights clause that would exclude the Union from decision
making, and proposing a worthless grievance procedure.
Neises cannot avoid contempt simply because the order did
not specifically enumerate every possible violative act.
McComb, 336 U.S. at 192–93.
 3.
 Neises’s final argument is that commanding it to bargain
in good faith amounts to an impermissible “obey-the-law”
command. It relies on the Supreme Court’s directive that the
Board cannot seek to enforce every aspect of the National La-
bor Relations Act in contempt proceedings just because a
party violated one aspect of the Act. NLRB v. Express Pub. Co.,
312 U.S. 426, 433 (1941). The Board may seek to hold a party
in contempt only for violations that are similar or fairly re-
lated to the unfair labor practice that gave rise to the original
order enforcing the Board’s decision. See id. at 435. Neises ar-
gues that the Board cannot use these contempt proceedings to
charge it with bad faith bargaining because that is not similar
or fairly related to the unfair labor practice that gave rise to
this case.
 This argument depends on the proposition that failing to
bargain in good faith is unrelated to Neises’s failure to recog-
nize or bargain with the Union at all. See McComb, 336 U.S. at
192–93. We reject this argument; Neises’s failure to bargain in
good faith is related to its initial failure to recognize and to
bargain with the Union. As the Supreme Court has noted,
“the duty of management to bargain in good faith is essen-
tially a corollary of its duty to recognize the union.” Ins.
Agents Int’l Union, 361 U.S. at 484–85.
No. 18-1774 17

 Neises significantly violated our unambiguous command
to bargain in good faith with the Union and failed to make
reasonable and diligent efforts to comply with that command.
Therefore, in an order issued on January 6, 2023, we adjudi-
cated Neises in civil contempt.
 II.
 Following our contempt order, we afforded the parties the
opportunity to present their views on the appropriate rem-
edy. Each side has responded. The Board also has submitted
 25
a proposed order. The parties have employed that proposed
order as an outline for their discussion of an appropriate rem-
edy. We also refer to that document and indicate, in the course
of our discussion, those areas where alteration is required.
Neises does not oppose all the measures proposed by the
 26
Board. We therefore limit our discussion to those matters
contested by Neises or where we think some elaboration will
assist the parties.

25 The Board’s proposed order is contained in its motion for an order im-
posing contempt remedies. See App. Dkt. 41 at 3–12. The proposed reme-
dies are contained in numbered paragraphs, beginning at paragraph 5. See
id.
26 The following proposed remedies are uncontested aside from Neises’s
ongoing contention that it cannot be ordered to bargain in good faith: Pro-
posed remedies 5(b), (c)(i), (c)(ii), (d), (e). Briefly, proposed remedy 5(b)
requires good-faith bargaining, 5(c)(i) requires Neises to withdraw its pro-
posals that retracted previous tentative agreements, 5(c)(ii) requires
Neises to commit to its previous tentative agreements, 5(d) requires
Neises to meet and bargain in good faith at least once every thirty days,
and 5(e) requires Neises to continue to meet and bargain until the parties
reach an agreement or a bona fide impasse. See App. Dkt. 41 at 4–5.
18 No. 18-1774

 The Board asks us to impose substantial contempt reme-
dies. It submits that these remedies are warranted because of
Neises’s history of contumacious conduct. In crafting a rem-
edy, we must keep in mind the dual purposes of civil con-
tempt: (1) to coerce the party in contempt into compliance,
and (2) to compensate the complainant for losses caused by
the defendant’s noncompliance. Taggart, 139 S. Ct. at 1801.
Therefore, the remedy we impose must be sufficient to bring
Neises into compliance, see United States v. United Mine Work-
ers of Am., 330 U.S. 258, 304 (1947), and also must accord “full
remedial relief,” McComb, 336 U.S. at 193. In short, the nature
and extent of the contumacious conduct determines the na-
ture and extent of the remedy.
 A.
 1.
 Neises first objects to any proposed remedy that includes
 27
the phrase “good faith.” It continues to assert that “good
faith bargaining” is too subjective and ambiguous a term to
give explicit notice of what is required. Neises also objects to
several related terms in the proposed remedies, such as “good
cause” and “predictably unacceptable bargaining pro-
 28
posals.”
 This objection has no merit. In adjudicating Neises in con-
tempt, we already have concluded that an order to bargain in
good faith is not impermissibly ambiguous. There is no “fair
ground of doubt” about what is required. Taggart, 139 S. Ct.

27 That phrase can be found in the Board’s proposed remedies 5(a), (b),
(c), (d), (e) and 6.
28 See App. Dkt. 66 at 3–4.
No. 18-1774 19

at 1799 (emphasis omitted). “[T]he duty of management to
bargain in good faith is essentially a corollary of its duty to
recognize the union.” Ins. Agents Int’l Union, 361 U.S. at 484–
85; see also Overnite Transp. Co., 938 F.2d at 821 (noting that the
duty to bargain “requires the employer to approach collective
bargaining with a good faith intention … to come into agree-
ment”). Nor are the other terms to which Neises objects fatally
ambiguous. Withdrawing tentative agreements without good
cause is a sign of bad-faith bargaining. Polycon Indus., 821 F.3d
at 907. Requiring Neises to adhere to tentative agreements if
it lacks good cause to change its position is therefore unre-
markable.
 2.
 The Board proposes ordering Neises to “[c]ommit to its
prior tentative agreements made with the Union during bar-
 29
gaining as they existed on May 28, 2020.” Neises does not
contest this remedy. In the Board’s reply, however, it goes fur-
ther, asking us to rule that the extra sentence in the Union’s
version of Article II, Section 3 is part of the parties’ tentative
agreements.
 We deny the Board’s request to rule that the extra sentence
in Article II, Section 3 as part of the parties’ tentative agree-
ments. But our denial does not prevent the parties from con-
tinuing to bargain over how employees can authorize the de-
duction of their Union dues. We therefore clarify the pro-
posed remedy as follows:
 Commit to the tentative agreements made with
 the Union during bargaining as contained in the

29 App. Dkt. 41 at 5.
20 No. 18-1774

 document labeled Exhibit QQ, which the Spe-
 cial Master determined are the agreements as
 they existed on May 28, 2020.
 3.
 Neises next objects to the proposed requirement that it be
required to present written proposals on all issues over which
the parties have not yet reached a tentative agreement. It asks
the court to clarify that oral proposals during bargaining are
acceptable.
 An order to present written proposals in advance of bar-
gaining sessions is certainly warranted here in light of
Neises’s prior bargaining conduct. To address Neises’s con-
cern, however, we amend the proposed order as follows:
 Before each bargaining session, present written
 proposals for further bargaining on all issues
 that remain unresolved by tentative agree-
 ments. This requirement does not limit good-
 faith oral responses and counterproposals dur-
 ing bargaining sessions. Any resulting tentative
 agreements shall be promptly memorialized in
 writing.
 4.
 Neises next objects to the proposed requirement that it in-
form each of its agents or representatives of the judgment,
2020 consent order, and contempt adjudication. It maintains
that the Board has not identified a basis for this remedy and
that the language is unclear about what documents it must
pass along.
No. 18-1774 21

 This objection is without merit. Neises can only bargain
through its representatives, who must be apprised of our or-
ders to ensure compliance with them. See Connolly v. J.T. Ven-
tures, 851 F.2d 930, 935 (7th Cir. 1988). We therefore impose
this requirement.
 5.
 Neises next objects to the requirement that it post notices
to employees of the court’s orders and contempt adjudication
and to file a sworn statement attesting to the steps it has taken
to comply. Neises also objects to permitting the Board access
to its facilities to ensure compliance. It argues that giving the
Board access is only appropriate if there is a demonstrated
likelihood that it will fail to cooperate.
 These objections have no merit. Notice-posting is a com-
mon purgation remedy. See, e.g., Hoffman Plastic Compounds,
Inc. v. NLRB, 535 U.S. 137, 152 (2002). The Board describes it
 30
as “sacrosanct.” Here, Neises has shown itself likely to flout
our orders, so allowing the Board access to ensure compliance
is appropriate. Notably, Neises has already agreed to these
remedies in the previous consent orders.
 B.
 1.
 In its motion for contempt remedies, the Board requested
a monetary penalty “as contemplated in the 2020 Consent Or-
 31
der.” Neises objects on the basis that the Board did not

30 App. Dkt. 69 at 5.

31 App. Dkt. 41 at 7.
22 No. 18-1774

specify the amount of the penalty. It further submits that it
should not be penalized for defending against the contempt
petition.
 The Board, in its reply, clarifies that it seeks $192,400 in
penalties. It arrives at this number as follows: an initial
$10,000 fine per violation (the Board stipulates that there is
just one violation here – failing to bargain in good faith), plus
$200 per day that violation continued, running from August
4, 2020, through February 2, 2023 (totaling 912 days). Neises’s
protest that it will be fined for defending the contempt peti-
tion relies on a false premise. It agreed to this fine schedule in
the 2020 consent order and judgment. The penalty we impose
here is designed to address Neises’s failure to comply with
our prior orders and to coerce Neises into compliance.
 Neises also moves to file a sur-response to contest the pen-
alty amount. We grant the motion only insofar as it relates to
the amount of the penalty; Neises’s other arguments are im-
proper. Neises argues that it cannot be penalized for failing to
bargain after the Board decided to initiate contempt proceed-
ings because, at that point, the Union refused to resume bar-
gaining. But this argument misrepresents the record. The Un-
ion said it would resume bargaining if Neises retracted its re-
gressive proposals; only if Neises did not would the Union
 32
“let things play out” in the contempt proceedings. Thus, this
conditional refusal did not affect how long Neises’s violation
has continued. We impose the full financial penalty the Board
requests.

32 See SM. Dkt. 71-3 at 3–4.
No. 18-1774 23

 2.
 The Board further seeks an award of the Union’s “reason-
able costs and expenses attributable” to Neises’s violation of
the 2020 consent order. Neises objects that this remedy vio-
lates the “American Rule” that prevailing parties are not
awarded attorneys’ fees without statutory authorization. See
Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121, 126 (2015).
Neises acknowledges an exception for civil contempt cases.
See Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S.
714, 718 (1967).
 We will award compensatory damages to the Union. Be-
cause civil contempt proceedings are partly about compensat-
ing the prevailing party, McComb, 336 U.S. at 191, compensa-
tory damages are typically required, see Thompson v. Cleland,
782 F.2d 719, 722 (7th Cir. 1986). As the party that charged
Neises with an unfair labor practice, the Union is a prevailing
party here. See Ahearn v. Int’l Longshore & Warehouse Union,
721 F.3d 1122, 1128 (9th Cir. 2013) (“the charging party … is
entitled to compensation for its actual damages”); 29 C.F.R.
§ 102.1(h) (defining “party”). The Union will submit its costs
within thirty days of the court’s opinion. Neises may object to
those costs within twenty-one days; if it does, the Union may
reply within fourteen days of Neises’s objections.
 3.
 The Board seeks its own attorneys’ fees, calculated at the
prevailing rate in Washington D.C. It argues that Neises has
unreasonably and vexatiously multiplied the proceedings by
making frivolous arguments.
 Neises objects, saying it simply responded to all filings in
this contempt case and that it has not unreasonably and
24 No. 18-1774

vexatiously multiplied the proceedings. It insists that its ar-
guments were based on its reasonable beliefs and had a plau-
sible legal or factual basis. See Jolly Grp., Ltd. v. Medline Indus.,
Inc., 435 F.3d 717, 720 (7th Cir. 2006). Finally, Neises argues
that the Board’s attorneys’ fees should be calculated at their
actual salary rates, not the prevailing market rate in Washing-
ton D.C. See Wisconsin v. Hotline Indus., Inc., 236 F.3d 363, 366–
67 (7th Cir. 2000).
 We will award the Board’s attorneys’ fees. We have dis-
cretion to award attorneys’ fees. See Tranzact Techs., Inc. v.
1Source Worldsite, 406 F.3d 851, 855 (7th Cir. 2005); CFTC v.
Premex, Inc., 655 F.2d 779, 785 (7th Cir. 1981); In re Establish-
ment Inspection of Microcosm, 951 F.2d 121, 126 (7th Cir. 1991).
These fees are regularly awarded in contempt cases. See NLRB
v. Haven Salon + Spa, No. 21-2413, 2023 WL 2230865, at *2 (7th
Cir. Feb. 27, 2023) (awarding attorneys’ fees for contempt);
NLRB v. Loc. 825, Int’l Union of Operating Eng’rs, 430 F.2d 1225,
1230 (3d Cir. 1970); NLRB v. Goren Printing Co., 1990 WL
300325, at *12 (1st Cir. Sept. 28, 1990) (unpublished). Here,
Neises has pursued arguments “without a plausible legal or
factual basis and lacking in justification.” Jolly Grp., Ltd.,
435 F.3d at 720 (quoting Pac. Dunlop Holdings, Inc. v. Barosh, 22
F.3d 113, 119 (7th Cir. 1994)). Attorneys’ fees, moreover, are
not duplicative of the contempt penalty. See Premex, Inc., 655
F.2d at 785.
 And the Board’s fees will be computed at the prevailing
market rate in Washington D.C., where the Board’s attorneys
are based. Neises’s reliance on Hotline Industries, Inc., 236 F.3d
at 366–67, is misplaced. There, the court was confronted with
an unusual statutory scheme that limited attorneys’ fees to
“actual expenses.” Id. at 367. But “reasonable fees” are
No. 18-1774 25

generally calculated at the prevailing market rate. Id.; see also
Blum v. Stenson, 465 U.S. 886, 895 (1984); NLRB v. Loc. 3, Int’l
Brotherhood of Elec. Workers, 471 F.3d 399, 406–07 (2d Cir. 2006).
The Board will submit its attorneys’ fees within thirty days of
the court’s final opinion. Neises may object to the Board’s cal-
culation within twenty-one days; if it does, the Board may re-
ply within fourteen days.
 C.
 The Board also seeks an order extending by six months the
certification of the Union as the exclusive representative of the
bargaining unit. It submits that such an order is necessary for
three reasons: (1) to vindicate the employees’ rights under
section 7 of the National Labor Relations Act, which have
been trampled by Neises; (2) to remove Neises’s incentive to
delay bargaining; and (3) to demonstrate that the court will
not permit Neises to flout its orders.
 Neises objects, submitting that the decertification bar pro-
tects the Union, not employee rights. It notes that most of the
employees filed a petition to decertify the Union, although the
Board dismissed that petition. It argues that the remedy “im-
pacts employee Section 7 rights, which have already been
 33
suppressed for several years.”
 Neises’s objection has no merit under the circumstances of
this case. There is no doubt that a decertification bar is an ex-
traordinary remedy. See Ron Tirapelli Ford, Inc. v. NLRB, 987
F.2d 433, 439 (7th Cir. 1993). But this remedy is appropriate
when an employer engages in “outrageous and pervasive”
unfair labor practices. Id. at 440 (citing NLRB v. Gissel Packing

33 App. Dkt. 66 at 14.
26 No. 18-1774

Co., 395 U.S. 575, 611–13 (1969)). The remedy is also appropri-
ate when less outrageous conduct nevertheless “erode[s] ma-
jority strength or adversely affect[s] the election process.” Id.
And a decertification bar that lasts six months is appropriate
when the employer’s failure to bargain in good faith is part of
its effort to “poison[] the bargaining process.” Rock-Tenn Co.
v. NLRB, 69 F.3d 803, 810 (7th Cir. 1995); see also NLRB v. Goya
Foods of Fl., 525 F.3d 1117, 1128–29 (11th Cir. 2008) (approving
a decertification bar lasting up to one year).
 A six-month decertification bar is appropriate here. Neises
has engaged in outrageous and pervasive conduct. It has
flouted this court’s orders for years and refused to bargain in
good faith. Ron Tirapelli Ford, 987 F.2d at 441 (noting that “if
the employer’s violation is deliberate and egregious enough”
a decertification bar is appropriate). The Board says that
 34
Neises’s conduct has eroded the Union’s majority strength.
See id. at 440. Given Neises’s pattern of inhibiting bargaining,
it is no surprise that the employees’ faith in the Union may
have weakened. Without extending the certification period,
Neises may well obtain the object of its obstructive behavior:
the Union’s destruction. The employees may still choose to
decertify—that is their prerogative—but a six-month exten-
sion will give them a fair opportunity to assess their interests
on a level playing field. See Gissel, 395 U.S. at 613 (noting that
a temporary decertification bar does not prevent employees
from later disavowing the Union).

34 See App Dkt. 69 at 10.
No. 18-1774 27

 D.
 Next, the Board requests an enhanced prospective fine
schedule against Neises: $20,000 per violation and $300 per
day for each day the violation persists. It also seeks a prospec-
tive fine schedule against Neises’s bargaining representa-
 35
tives who help Neises violate our orders: $5,000 per viola-
tion and $100 per day for each day the violation continues. It
says that this remedy is necessary to assure purgation and de-
ter future violations.
 Neises objects. It says that the Board provides no evidence
that the fines will accomplish their purpose. It also notes that
prospective fines are not supposed to be punitive. Neises fur-
ther objects to fines against its bargaining representatives,
saying this would restrict its constitutional right to counseled
representation and advice. It also says that it would be chal-
lenging to determine whether counsel has violated this order
without delving into privileged communications.
 We will impose the prospective fine schedule against
Neises, but not its bargaining representatives. The point of a
prospective fine is to coerce future compliance. See United
Mine Workers of Am., 330 U.S. at 304. Here, earlier prospective
fines proved insufficiently onerous to prevent Neises’s behav-
ior. Increasing the prospective penalties Neises faces will aid

35We employ “bargaining representatives” as a stand-in for the lengthier
formulation the Board provides: “each of Neises’s officers, agents, attor-
neys, successors, and assigns, and persons who, having knowledge of the
Judgement, Consent Order, and Contempt Adjudication, act in active con-
cert or participation with Respondent” regardless of whether they are
named as a respondent in the contempt adjudication. App. Dkt. 41 at 9–
10.
28 No. 18-1774

in deterring Neises from persisting in its contumacious con-
duct.
 We decline, however, to impose this prospective fine
schedule against Neises’s bargaining representatives. True, a
corporation can only act through its officers, agents, etc., Con-
nolly, 851 F.2d at 935, and it is well established that such per-
sons can be punished for the corporation’s misconduct, Tran-
zact Techs., Inc., 406 F.3d at 856. When “those who are officially
responsible for the conduct of [the business’s] affairs” know-
ingly violate court orders aimed at the business, “they, no less
than the corporation itself, are guilty of disobedience, and
may be punished for contempt.” Wilson v. United States, 221
U.S. 361, 376 (1911). Even so, the unusual remedy of imposing
prospective personal liability against Neises’s bargaining rep-
resentatives does not currently seem necessary given the
other remedies we are imposing, including a significant pro-
spective fine schedule against Neises itself.
 E.
 1.
 The Board also asks for various remedies that would re-
quire ongoing court involvement. It proposes that we require
prior approval from this court before Neises can implement
any proposal after reaching a “lawful and legitimate bargain-
 36
ing impasse.” Neises submits that this determination is for
the Board, not for the court.
 Neises has the better argument here. It is generally the
Board’s role to determine whether any impasse is lawful. See
Mike-Sell’s Potato Chip Co. v. NLRB, 807 F.3d 318, 325 (D.C. Cir.

36 App. Dkt. 41 at 10.
No. 18-1774 29

2015). We therefore will alter the proposed remedy accord-
ingly:
 Respondent Neises may not, without prior ap-
 proval from the National Labor Relations
 Board, implement any bargaining proposal
 without the agreement of the Union based on an
 assertion of a lawful and legitimate bargaining
 impasse.
 2.
 The Board also proposes requiring Neises to provide ad-
vance notice to the Board, the Union, and this court, before it
seeks outside help to resolve bargaining disputes with the
Union. Neises submits that the Board identifies no basis for
this remedy.
 We agree with Neises. The Board provides inadequate jus-
tification for this broad remedy. We see no reason to restrict
the parties’ ability to resolve any future disputes without re-
sorting to the courts.
 3.
 The Board also asks that our order provide that, upon the
Board’s motion, further bargaining disputes be subjected to
supervised mediation or if the parties agree, to interest arbi-
tration. It also asks that it be permitted to move for future ne-
gotiations to be transcribed at Neises’s expense. Neises main-
tains that the Board provides no basis for such remedies.
 The Board’s request that, should it become necessary, it
can ask us to require Neises to pay for the transcription of fu-
ture negotiations is reasonable here. The court has authority
to grant such relief as is necessary to ensure compliance with
30 No. 18-1774

its orders. McComb, 336 U.S. at 193–94. Here, Neises was able
to obscure what the parties agreed to, in part, because the ne-
gotiation process was not always clear. To head-off future dis-
putes of a similar nature, transcription may become appropri-
ate. If it does, the Board may request that we order that future
negotiations be transcribed at Neises’s expense. Ordering
court-supervision of the bargaining process at the Board’s
motion, however, is not appropriate at this time. There are al-
ternate and less intrusive remedies available should the need
arise.
 4.
 The Board proposes requiring Neises to provide advance
notice to the Board, the Union, and the court if Neises closes
or files for bankruptcy. Neises objects that this restricts its
ability to dissolve or enter bankruptcy, in violation of its “ab-
solute right to terminate its business for any reason [it]
pleases.” First Nat’l Maint. Corp. v. NLRB, 452 U.S. 666, 677
(1981) (quoting Textile Workers v. Darlington Co., 380 U.S. 263,
268 (1965)).
 The Board maintains, however, that this remedy does not
interfere with Neises’s ability to close; it just requires advance
notice. It justifies this incursion on Neises’s prerogatives as
necessary so that the Board can determine that Neises is not
trying to dissolve simply to avoid its court-imposed obliga-
tions.
 We think that this remedy will be sufficiently effective if
we limit advance notice to the Board and the Union, not the
court. Cf. Oil, Chem. & Atomic Workers Int'l Union v. NLRB, 547
F.2d 575, 597 (D.C. Cir. 1976) (prohibiting the employer from
“threatening to go out of business or close the plant on
No. 18-1774 31

account of the union”). If any of Neises’s future closure or
bankruptcy decisions require additional involvement from
this court, the Board will notify the court.
 5.
 The Board also proposes requiring Neises to inform the
Board, the Union, and this court at least fourteen days in ad-
vance of any expenditure that will exceed $5,000. Neises
points out that this would cripple its ability to operate. The
Board’s reply does not address this concern.
 The Board has not justified this proposal adequately.
Neises’s concern that this remedy would cripple the business
is realistic. Requiring two-weeks’ notice of any and every
transaction that exceeds $5,000 would put Neises in an unre-
alistic bind. We therefore decline to impose this remedy.
 Conclusion
 Except as otherwise specified in this opinion, the Board’s
requested remedies will be imposed as requested. The Board
may submit for approval an order and judgment that con-
forms with this opinion.
 The Board may recover its costs.
 It is so ordered.